996 So.2d 266 (2008)
In re Bryan M. WHITE.
No. 2008-B-1390.
Supreme Court of Louisiana.
December 2, 2008.
Charles Bennett Plattsmier, Baton Rouge, Damon Shawn Manning, for applicant.
Unglesby & Marionneaux, Lewis Owens Unglesby, Baton Rouge, Dane S. Ciolino, New Orleans, Bryan M. White, Metairie, for respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Bryan M. White, an attorney licensed to practice law in Louisiana but currently on interim suspension.

UNDERLYING FACTS
By way of background, respondent was at all times pertinent to this matter employed as Vice President and General Counsel for business entities controlled by New Orleans restaurateur Al Copeland.[1] *267 In 2000, Mr. Copeland was divorced from his third wife, Luan Hunter. Initially, Mr. Copeland and Ms. Hunter resolved the issues in the domestic proceeding by consent, including the custody of their three-year old son, which the parties agreed would be jointly shared. However, by October 2001, the litigation between Mr. Copeland and Ms. Hunter had become contentious. In particular, the parties could not agree upon the amount of visitation they would each exercise with their son during the holidays, nor could they agree on whether (or where) their son would attend preschool. The domestic proceeding was allotted to Judge Ronald Bodenheimer of the 24th Judicial District Court for the Parish of Jefferson. Respondent acted as a personal representative of Mr. Copeland in this proceeding; however, he was not enrolled as Mr. Copeland's attorney of record.[2]
While the domestic proceeding was ongoing, respondent engaged in numerous instances of ex parte communications with Judge Bodenheimer, including the following:
 A series of telephone calls between respondent and Judge Bodenheimer wherein litigation strategy and tactics in the Copeland case were discussed and agreed upon.[3] These telephone calls occurred between October 2001 and approximately April 2002.
 Beginning in January 2002 and continuing through early March of that year, a series of telephone calls wherein Judge Bodenheimer requested that respondent provide him with information regarding the prices that Mr. Copeland's restaurants paid for fresh seafood. Judge Bodenheimer apparently intended to use this information to bid on a lucrative contract to supply seafood to the Copeland's restaurants. Respondent agreed to obtain the seafood pricing information and provide it to Judge Bodenheimer. When he ultimately did so, respondent intentionally gave Judge Bodenheimer an out-of-date series of seafood prices which proved to be largely useless for the judge's purposes.
 On March 12, 2002, at the request of Judge Bodenheimer, respondent agreed to make arrangements for the judge's daughter and seven of her *268 friends to celebrate her 21st birthday at one of Mr. Copeland's restaurants. Respondent sent a fax to the restaurant with his authorization to "comp" the drinks and appetizers, the cost of which totaled $359.16. In addition, respondent gave gift certificates for one of Mr. Copeland's restaurants to each member of Judge Bodenheimer's court staff.
Judge Bodenheimer and others subsequently became the targets of an investigation by federal law enforcement officers.[4] On June 5, 2002, respondent was interviewed by the FBI. During the interview, respondent admitted that he felt "uncomfortable" with Judge Bodenheimer's actions relative to the seafood prices and a potential contract. However, respondent failed to admit to the FBI the full extent of Judge Bodenheimer's corrupt conduct.
In 2003, respondent was indicted in the United States District Court for the Eastern District of Louisiana. On February 13, 2003, respondent pled guilty to a onecount superseding bill of information for misprision of felony, the crime of concealing knowledge of a felony by one who has not participated or assisted in it. In the factual basis accompanying the plea, respondent admitted that if the case against him were to proceed to trial, the government would prove beyond a reasonable doubt that he committed the offense of misprision of felony relative to a conspiracy involving Judge Bodenheimer and others "to injure, oppress, threaten and intimidate a litigant," namely Ms. Hunter, "in the free exercise and enjoyment of a right secured to her by the laws and Constitution of the United States; that is, the right to a trial before an impartial tribunal." More specifically, respondent admitted that he had actual knowledge of the conspiracy by Judge Bodenheimer and others to deprive Ms. Hunter of her civil rights and failed to report it to a judge or someone in civil authority, and in fact, affirmatively concealed the full extent of his knowledge when he was questioned by the FBI in June 2002. On May 21, 2003, respondent was sentenced to serve one year and one day in federal prison, followed by one year of supervised release. He was also ordered to pay a $10,000 fine.[5]

DISCIPLINARY PROCEEDINGS
On June 24, 2003, this court placed respondent on interim suspension based on his conviction of a serious crime. In re: White, 03-1425 (La.6/24/03), 852 So.2d 976.
On June 3, 2004, the ODC filed two counts of formal charges against respondent, alleging that his conduct as set forth above violated the following Rules of Professional Conduct: Rules 3.5(a) (a lawyer shall not seek to influence a judge by means prohibited by law), 3.5(b) (prohibited ex parte communications), 3.5(c) (a lawyer shall not engage in conduct intended to disrupt a tribunal), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act reflecting adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 8.4(c) (engaging in conduct involving dishonesty, *269 fraud, deceit, or misrepresentation), 8.4(d) (engaging in conduct prejudicial to the administration of justice), and 8.4(f) (knowingly assisting a judge in conduct that is a violation of applicable Rules of Judicial Conduct or other law). Considering this misconduct, the ODC further alleged that respondent "has assisted in the intentional corruption of the judicial process thereby warranting consideration of the sanction of permanent disbarment."[6]
Respondent answered the formal charges and admitted his conviction. He also admitted that he knew of, but did not timely report to the appropriate authorities, the conspiracy by Judge Bodenheimer and others to violate Ms. Hunter's civil rights; however, respondent contended that he was obliged by the Rules of Professional Conduct to keep that information confidential. Respondent further admitted that he engaged in several ex parte communications with Judge Bodenheimer,[7] and that these communications were improper. However, respondent denied that he initiated the communications, which he asserted "were prompted by repeated requests and calls from Bodenheimer" and Philip Demma, an acquaintance of Al Copeland.[8] Respondent described his involvement with Judge Bodenheimer as "reluctant" and "reactive," rather than "proactive," and "then only to prevent harm to his client's case rather than to influence the outcome affirmatively and nefariously." Respondent also denied that his conduct actually corrupted or prejudiced the Copeland domestic case, because none of Judge Bodenheimer's rulings were substantively or procedurally improper and none were reversed on the merits. Finally, respondent asserted that permanent disbarment is not warranted in this matter. He denied that he engaged in the intentional corruption of the judicial process, or that his conduct was equivalent to bribery, perjury, or subornation of perjury, "given that his purpose in communicating with Judge Bodenheimer was merely to prevent harm to his client's case by responding to persistent calls from a then-respected judge acting both as an informal, quasi-judicial mediator and as a judicial arbiter of a family-law dispute."

Joint Stipulation of Facts
Prior to the hearing on the formal charges, respondent and the ODC entered into a joint stipulation of facts, including the following:
6. As Mr. Copeland's corporate attorney, respondent did not practice domestic law but allowed himself to become peripherally involved in the ongoing domestic relations dispute between Mr. Copeland and Ms. Hunter.
7. During those domestic relations proceedings before former Judge Bodenheimer, respondent and lawyers representing Ms. Hunter engaged in ex parte communications with the Court which were of a substantive nature.
8. Respondent's ex parte communications with Judge Bodenheimer violated *270 the Louisiana Rules of Professional Conduct 3.5 and 8.4(a).
9. In early 2002, Bodenheimer and an associate, Philip Demma, believed that an opportunity existed to pursue a seafood supply contract with Al Copeland and his many restaurants that would prove lucrative to Bodenheimer and his associates.
10. During the course of the domestic relations proceedings between Mr. Copeland and Ms. Hunter, Bodenheimer caused Philip Demma to communicate with respondent with a request that he obtain and secure seafood pricing information for Copeland's restaurants. Respondent eventually learned that Bodenheimer wanted the information to allow Bodenheimer and his associates to submit a more competitive bid for the supplying of substantial quantities of seafood.
11. The evidence indicates that in response to repeated requests from Bodenheimer and Demma, respondent deliberately supplied only out of date, limited pricing information which was relatively useless for Bodenheimer's purposes. Despite continued requests from Bodenheimer and Demma, respondent took no further action.
12. Respondent's refusal to cooperate with Judge Bodenheimer with regard to seafood pricing information created significant frustration by Bodenheimer and ultimately prevented Bodenheimer's hoped-for seafood supply contract from ever materializing.
13. Respondent's ex parte communications with Judge Bodenheimer about seafood pricing information violated Rule 3.5 and Rule 8.4(a) of Louisiana's Rules of Professional Conduct.
14. During the course of the Copeland/Hunter domestic relations proceedings, Bodenheimer requested and respondent provided complimentary appetizers and refreshments at one of Copeland's restaurants to Bodenheimer's daughter for a birthday. Although it was (and is) a regular and common practice of Copeland's restaurants to provide complimentary food and beverages to various members of the public, respondent acknowledges that he should have declined Judge Bodenheimer's request.
15. Additionally, on another occasion, respondent provided promotional gift cards for complimentary food and refreshments at a Copeland's restaurant to members of Bodenheimer's staff during the time that the Copeland/Hunter proceedings were then pending. Although it was (and is) a regular and common practice of Copeland's restaurants to provide complimentary food and beverages to various members of the public, respondent acknowledges that he should have declined to furnish these promotional gift cards.
16. Additionally, respondent attended a lunch meeting with Bodenheimer initiated by Demma and Bodenheimer during which the judge discussed his re-election campaign and requested seafood pricing information.
17. Respondent's conduct reflects violations of Rules 3.5 and 8.4(a).
18. On February 13, 2003, respondent pled guilty to one count of misprision of felony in violation of 18 U.S.C. § 4. While doing so respondent acknowledged that he did not "fully disclose" everything that he *271 knew about the Bodenheimer/Demma conspiracy when interviewed by the FBI. He did admit to the agents that he "felt uncomfortable" with Bodenheimer's actions relative to the seafood prices and potential contract. Respondent's criminal conviction violated Rules of Professional Conduct 8.4(b) and 8.4(a).

Hearing Committee Report
Based upon the testimony and evidence introduced at the formal hearing, the hearing committee made the following findings of fact:
1. Respondent pleaded guilty to misprision of felony relative to a conspiracy to violate civil rights.
2. As a result of his guilty plea, four years ago the Louisiana Supreme Court ordered that respondent be interim suspended from the practice of law. [Emphasis in original.]
3. Respondent engaged in ex parte communications with the Judge that was trying his client's case. This happened ten or twelve times over a six-month span. Many of the conversations were of a substantive nature. Judge Bodenheimer initiated most of the communications. Ex parte communication was a practice the Judge adopted with the attorneys in the case.
4. Respondent at the request of Judge Bodenheimer gave gift cards to the Judge's court personnel.[[9]] The cards were to Al Copeland's restaurant at the time that Mr. Copeland's domestic case was being handled by Judge Bodenheimer.
5. Respondent at the request of Judge Bodenheimer gave the Judge's daughter complimentary drinks and appetizers for her 21st birthday party for seven to one of Al Copeland's restaurants at the time that Mr. Copeland's domestic case was being handled by Judge Bodenheimer.
6. While his client's case was pending before Judge Bodenheimer, respondent had lunch with Judge Bodenheimer at which they discussed the Judge's reelection campaign and seafood pricing.
7. Respondent at the request of Judge Bodenheimer reluctantly provided seafood pricing information to the Judge. The information was old and imprecise.
Based upon these factual findings, the committee determined that respondent influenced a judge by means prohibited by law and engaged in ex parte communications with Judge Bodenheimer, in violation of Rules 3.5(a) and (b) of the Rules of Professional Conduct. In pleading guilty to misprision of felony, respondent violated *272 Rules 8.4(a), (b), and (c), and "his involvement in the overall affair" violated Rules 8.4(d) and (f). The committee determined that the applicable baseline sanction is disbarment.
In aggravation, the committee recognized respondent's substantial experience in the practice of law (admitted 1987). The committee also commented that because respondent's client was a "celebrity," this matter was covered heavily by the news media. It caused a perception that money and power determine the outcome of judicial proceedings, not justice, which resulted in substantial injury to the public and the legal profession.
The committee accepted the mitigating factors to which the parties had stipulated, as follows: absence of a prior disciplinary record, timely good faith effort to make restitution or to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board and a cooperative attitude toward the disciplinary proceeding, character and reputation, imposition of other penalties or sanctions, and remorse. In addition, the committee found that Judge Bodenheimer "used" respondent, and that respondent "allowed himself to be a pawn. He was taken advantage of. He found it difficult to say no to a Judge, especially one who was presiding over his only client's case."
Finding these mitigating circumstances warrant a downward deviation from the baseline sanction of disbarment, the committee recommended that respondent be suspended from the practice of law for thirty-six months, retroactive to June 24, 2003, the date of his interim suspension.
Neither respondent nor the ODC filed an objection to the hearing committee's recommendation.[10]

Disciplinary Board Recommendation
The disciplinary board found the hearing committee's factual findings are not manifestly erroneous and adopted same. The board made the following determinations concerning the alleged violations of the Rules of Professional Conduct:
Rule 3.5  Respondent violated Rules 3.5(a), (b), and (c), as charged. Respondent admitted that he had an ex parte conversation with Judge Bodenheimer about Ms. Hunter's recusal motion; respondent provided Judge Bodenheimer with shrimp prices, which Judge Bodenheimer sought for purposes of attempting to gain a seafood contract with Copeland; and respondent set up a birthday party for Judge Bodenheimer's daughter and seven of her friends. This conduct occurred while respondent's client's case was pending in Judge Bodenheimer's court.
Rule 8.4  In Count I, respondent violated Rules 8.4(a), (b), and (c) by his conviction for misprision of felony. Further, respondent admitted that he concealed information regarding the efforts of Judge Bodenheimer and Philip Demma to interfere with Ms. Hunter's right to an impartial tribunal.
In Count II, respondent violated Rules 8.4(a), (d), and (f), as charged. Respondent has admitted that his ex parte communications concerning seafood pricing information and his providing complimentary food and beverages for Judge Bodenheimer's daughter were improper. *273 Even though respondent claims that the seafood pricing information he gave to the judge was useless, the board felt it was obvious that the acts of promising information and, ultimately, delivering useless information were intended to keep respondent's client, Al Copeland, in Judge Bodenheimer's favor. Also, even though it was a common practice of Al Copeland's restaurants to provide complimentary food and beverages to members of the public, providing such to Judge Bodenheimer's daughter at his request while respondent was handling a case in Judge Bodenheimer's court was highly improper. These actions are clearly prejudicial to the administration of justice, the board found.
Furthermore, in the ex parte conversations, respondent actively engaged in strategizing with Judge Bodenheimer and Philip Demma in order to obtain favorable rulings for his client, Al Copeland, while attempting to avoid the suspicion of the opposing party, Luan Hunter. For instance, in one ex parte conversation among Judge Bodenheimer, Demma, and respondent, the propriety of Demma attending a particular custody hearing was discussed. Respondent did not think Demma's attendance was prudent, stating that if Luan Hunter saw Demma there, she would think the "fix is in." In another instance, respondent relayed information to Judge Bodenheimer to help the judge craft a Christmas visitation proposal in a way that would ensure an outcome favorable to Al Copeland.
The board determined that by his conduct, respondent knowingly and intentionally violated duties owed to the public and to the legal system. His conduct caused actual harm to the legal system and was prejudicial to the administration of justice. Under the ABA's Standards for Imposing Lawyer Sanctions, the baseline sanction for respondent's misconduct is disbarment.
The board found the record supports the following mitigating factors: absence of a prior disciplinary record, full and free disclosure to the disciplinary board and a cooperative attitude toward the disciplinary proceedings, character or reputation, imposition of other penalties or sanctions, and remorse. The board found the record supports the following aggravating factors: dishonest or selfish motive, multiple offenses, illegal conduct, and substantial experience in the practice of law.
Finding respondent's conduct falls squarely within Guideline 2 of the permanent disbarment guidelines (intentional corruption of the judicial process), the board recommended that respondent be permanently disbarred. The board also recommended that respondent be assessed with all costs and expenses of these proceedings.
Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). When the disciplinary proceedings involve an attorney who has been convicted of a crime, the conviction is conclusive evidence of guilt and the sole issue presented is whether respondent's crimes warrant discipline, and if so, the extent thereof. Supreme Court Rule XIX, § 19(E); In re: Boudreau, 02-0007 (La.4/12/02), 815 So.2d 76; Louisiana State Bar Ass'n v. Wilkinson, 562 So.2d 902 (La.1990).
In the instant case, respondent stands convicted of one count of misprision *274 of felony.[11] This crime, which is itself a felony under federal law, is clearly a serious crime which warrants discipline by this court. Therefore, the only remaining issue is the appropriate sanction for respondent's misconduct. The resolution of that issue depends upon the seriousness of the offense, the circumstances of the offense, and the extent of the aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Perez, 550 So.2d 188 (La.1989).
There are three essential elements of the crime of misprision of felony: (1) knowledge that a felony was committed; (2) failure to notify the authorities of a felony; and (3) an affirmative step to conceal the felony. Standard 5.11 of the ABA's Standards for Imposing Lawyer Sanctions provides that disbarment is generally appropriate when a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice. Respondent's conduct necessarily entails fraud or deceit and thereby brings the offense of misprision of felony within the baseline standard of disbarment under Standard 5.11. Likewise, disbarment is the applicable baseline standard for respondent's conduct in engaging in ex parte communications with the trial judge presiding over his client's pending domestic litigation.
We are cognizant of several mitigating factors in this case, including the absence of prior disciplinary offenses, respondent's cooperation with the ODC, and the imposition of other penalties or sanctions in the criminal case. Nevertheless, considering the egregious nature of the conduct forming the basis of the criminal charges, and respondent's selfish motive in engaging in the misconduct, we do not find these mitigating factors justify a downward deviation from the baseline sanction of disbarment.[12]
In sum, we conclude respondent's misconduct involves elements of deceit and dishonesty which adversely reflect on his moral fitness to practice law. Accordingly, he must be disbarred.

DECREE
Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Bryan M. White, Louisiana Bar Roll number 18501, be and he hereby is disbarred, retroactive to his June 24, 2003 interim suspension. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
*275 CALOGERO, C.J., dissents; would impose as discipline a three year suspension from the practice of law.
NOTES
[1] Mr. Copeland died in March 2008.
[2] New Orleans attorney Robert Lowe was Mr. Copeland's attorney of record in the domestic proceeding. Respondent made no formal appearance in the proceeding other than responding to subpoenas duces tecum served on the Copeland business entities.
[3] For example, on November 7, 2001, respondent and Judge Bodenheimer had a conversation in which they discussed the basis for a recusal motion which had recently been filed by Ms. Hunter's counsel. Judge Bodenheimer instructed respondent to tell Mr. Copeland's counsel to file a discovery motion to seek Ms. Hunter's full grounds for recusal so that Judge Bodenheimer could be privy to the basis for the recusal motion. (At the conclusion of this conversation, respondent addressed Judge Bodenheimer as "pal" and suggested the two should "go have lunch.") Prior to any hearing on the motion to recuse, Ms. Hunter's counsel voluntarily withdrew the motion.

On December 11, 2001, respondent and Judge Bodenheimer had a conversation in which they decided that a particular social worker appeared to be taking a position favorable to Ms. Hunter. Judge Bodenheimer suggested that he and respondent could "get some mileage" by appointing the judge's former law partner as guardian ad litem for the minor child. On December 18, 2001, Judge Bodenheimer signed the appointment order.
On January 7, 2002, respondent called Judge Bodenheimer to schedule a hearing for Mr. Copeland to voice his complaints about Ms. Hunter. Judge Bodenheimer suggested that Mr. Copeland's counsel file a rule for contempt against Ms. Hunter. The rule was filed later that day.
[4] Judge Bodenheimer's term on the 24th Judicial District Court ended on December 31, 2002. In March 2003, he pleaded guilty to mail fraud arising out of the Copeland matter, as well as two unrelated counts of conspiracy. He was sentenced to serve 46 months in federal prison. In June 2003, he permanently resigned from the practice of law in lieu of discipline. In re: Bodenheimer, 03-1383 (La.6/18/03), 848 So.2d 540.
[5] Respondent paid the fine, but he was reimbursed by the Copeland companies pursuant to an indemnification agreement. The Copeland companies also paid for respondent's legal defense, both in the criminal case and in the instant matter.
[6] See Guideline 2 of the permanent disbarment guidelines, which provides that permanent disbarment may be warranted for "intentional corruption of the judicial process, including but not limited to bribery, perjury, and subornation of perjury."
[7] Respondent also pointed out that the other lawyers involved in the Copeland domestic matter engaged in ex parte communications with Judge Bodenheimer, including Ms. Hunter's lawyers.
[8] Mr. Demma was also a long-time acquaintance of Judge Bodenheimer's. He worked as a screening officer in Jefferson Parish Juvenile Court and as a reserve deputy for the Jefferson Parish Sheriff's Office.
[9] The record does not support the finding that respondent gave the gift cards to the court staff at the request of Judge Bodenheimer. Respondent testified that during a court hearing in October 2001, there was "a lot of idle time" as Judge Bodenheimer had requested to speak to Mr. Copeland and Ms. Hunter privately in his chambers. While the lawyers were waiting, the court staff asked respondent whether he had any "coupons" for the Cheesecake Bistro, a relatively pricey Copeland's restaurant which had opened in February of that year. Respondent said that he would see what he could do. As he was walking out of court after the hearing, respondent asked Judge Bodenheimer whether he minded if he gave "these girls some gift cards." Judge Bodenheimer agreed "that would be great," and so respondent gave each of the staff members a Cheesecake Bistro "Be My Guest" card, approximately $20 in value. See also Joint Stipulations, ¶ 15; cf. Joint Stipulations ¶ 14 ("... Bodenheimer requested and respondent provided complimentary appetizers and refreshments at one of Copeland's restaurants to Bodenheimer's daughter for a birthday.").
[10] In his pre-argument brief filed with the disciplinary board, respondent took issue with some aspects of the hearing committee's report, including the committee's determination that the applicable baseline sanction is disbarment. Nevertheless, respondent concurred in the committee's "ultimate recommendation" of a three-year suspension from the practice of law. In its brief, the ODC took the position that based on the record, it was "not prepared to suggest to the Board . . . that a three year suspension is unduly lenient."
[11] Misprision of felony is defined by 18 U.S.C. § 4 as follows:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.
[12] However, the mitigating factors are sufficient to cause us to reject the board's recommendation of permanent disbarment.