WEIMER, J.,
concurring in part, dissenting in part.
hi agree with the majority that the respondent has engaged in professional misconduct. However, I find some aspects of respondent’s conduct amounted to constitutionally protected speech, for which respondent cannot be sanctioned. Furthermore, I find the majority’s sanction of disbarment to be disproportional to respondent’s misconduct.
The majority finds that the respondent’s online and social media campaign was an orchestrated effort to inflame the public sensibility and to direct public criticism toward the judges presiding over child custody litigation-in both Louisiana and Mississippi. I do not doubt this was the respondent’s motivation. I also have no doubt that the respondent was wrong on several points for which she sought to have the public become incensed. Contrary to respondent’s internet postings, the Mississippi judge did not ignore audio recordings of the children. Rather, the recordings were never offered into evidence in the Mississippi proceeding. Similarly, and contrary to respondent’s postings, the Louisiana judge did not ignore evidence because proceedings in Louisiana were appropriately stayed in deference to the proceedings pending in Mississippi. After the Louisiana judge realized she would likely be a witness in the respondent’s disciplinary proceedings, the judge recused herself “to avoid the appearance of impropriety” in two unrelated cases in which respondent *1085 was counsel of record. However, the respondent followed this up by ^filing motions in two other unrelated eases in which the respondent misrepresented the judge had recused herself because of the judge’s “extreme bias” against the respondent.
Making misrepresentations in court pleadings is sanctionable. The misrepresentations within the respondent’s online and social media campaign and the fact that they were made by a lawyer representing the mother’s custody interests are also sanctionable. See Gentile v. State Bar of Nevada, 501 U.S. 1030, 1038, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (upholding the ability of a state supreme court to sanction an attorney who “knew or reasonably should have known his remarks created a substantial likelihood of material prejudice” to a judicial proceeding). The misrepresentations in respondent’s statements justify a sanction under Rule 3.5[1] for the substantial likelihood it would prejudicially disrupt the child custody proceedings, “since lawyers’ statements are likely to be received as especially authoritative.” Id. at 1074, 111 S.Ct. 2720. Also, to the extent respondent maintained internet resources, such as websites and social media, directing petitions to be sent to the Louisiana and Mississippi judges, I construe respondent’s actions as sanctiona-ble ex parte communications in violation of Rule 3.5.[2] This court’s majority goes further, however, and sanctions the very acts of ^criticizing judges and inspiring public criticism toward judges. In so doing, the majority impermissibly sanctions the respondent for engaging in constitutionally protected speech.
As the Court in Gentile explained, “[tjhere is no question that speech critical of the exercise of the State’s power lies at the very center of the First Amendment.” Id. at 1034-35, 111 S.Ct. 2720. Furthermore, “limits upon public comment about pending cases are ‘likely to fall not only at a crucial time but upon the most important topics of discussion.’” Id. at 1035, 111 S.Ct. 2720, quoting Bridges v. California, 314 U.S. 252, 268, 62 S.Ct. 190, 86 L.Ed. 192 (1941).
Indeed, because of the adversarial nature of our system of justice, criticism of judges is an expected part of the judicial system. Criticism of judges takes place regularly by parties who perceive they have been aggrieved by judges’ decisions. The appeals process actually requires parties — and the lawyers who represent them — to identify and criticize the aspects of judicial decisions with which they disagree. Had the respondent not peppered her criticism with misrepresentations, engaged in ex parte communications, engaged in conduct designed to gain an unfair advantage in on-going litigation, and broken a court-ordered seal imposed to protect confidentiality, the respondent’s online criticisms of the judges’ handling of the child custody matter would likely have *1086 been fully protected speech.[3] As the Supreme Court explained in Bridges, 314 U.S. at 270-71, 62 S.Ct. 190:
The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion .... And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.
|4Here, the respondent perceived there to be mistreatment of her client’s children and looked to the judicial system to address that mistreatment. In light of her evaluation of the situation, respondent’s initial efforts to invoke judicial action were both expected and appropriate. However, as an officer of the court, a lawyer must abide by the principle that cases should be decided by careful deliberation and application of the facts to the law, not by public clamor. Therefore, after the litigation was complete, the respondent would have been entitled to disseminate appropriate criticism — on the internet if she preferred— that the courts ignored the rule of law, if her representations had been true. But they were not.
Respondent cannot even lay claim to holding a reasonable belief in the veracity of some of her most significant criticisms. As noted earlier, there was simply no evidence that the Mississippi court had ignored tape recordings, which.allegedly revealed child abuse, when those recordings had never been submitted for the court’s consideration. I emphasize this example, because I believe it underscores that the respondent is passionate in her belief there is a need for society to prevent child abuse. Passionate belief is usually preferable to apathy and, regarding the need for society to prevent child abuse, only an unreasonable person would argue in favor of apathy. In every given case as to whether abuse has actually occurred and must be stopped, society has chosen the courts to be the ultimate arbiters. ' Because respondent, in her privileged role as a lawyer, is an officer of the court, both society and the government serving it have a justified expectation that officers of the courts will temper their public criticisms with truthful statements. See Gentile, 501 U.S. at 1031, 111 S.Ct. 2720 (explaining that lawyers “are key participants” in the justice system, “and the State may demand some adherence to that system’s precepts in regulating their speech and conduct.”).
| ^Respondent certainly did not champion the rule of law in her handling of information relating to her client’s children. Respondent sought and obtained the sealing of the record' in a case dealing with the children. However, respondent later released information in violation of the seal that she had obtained from the judicial system.
Therefore, I concur with the majority inasmuch as I find discipline is warranted for respondent’s misrepresentations, ex parte communications during on-going litigation, and breaking of a court-ordered seal. I dissent, however, from the majority’s inclusion of respondent’s acts of online criticism (apart from the impermissible content just noted) as sanctionable conduct.[4]
*1087 I further dissent as to the sanction. The Office of Disciplinary Counsel (ODC) recognizes that “[t]here is no Louisiana Jurisprudence addressing misconduct similar to Respondent’s” and relies on the jurisprudence of two other states[5] to support the | (¡recommended sanction of one year and one day suspension. While it is true that the novelty in Louisiana of the issues in this case presents certain challenges, this court is not without guidance and that guidance does not point to the disbarment the majority now imposes.
Specifically, the ABA Standards for Imposing Lawyer Sanctions address violations of a lawyer’s duties to the legal system. Respondent’s violations of her duties to the legal system are the crux of this case, even under the majority’s analysis. However, under the rubric of “Improper Communications with Individuals in the Legal Systems,” ABA Standard 6.32 provides a baseline sanction of a suspension for an ex parte “communication with an individual in the legal system when the lawyer ’knows that such communication is improper, and causes injury or potential injury to a party or cáuses interference or potential interference with the outcome of the legal proceeding.” Under the same rubric of improper communications, disbarment is reserved for an ex parte communication which “causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding.” ABA Standard 6.31(b). However, in its prosecution of this case, the ODC did not charge respondent with violating Rule 3.6[6] or even allege that respondent’s *1088 actions created a danger of imminent and substantial harm. Thus, the baseline sanction is suspension because of the potential for harm 17rather than a showing of actual harm. See ABA Standard 6.32; compare ABA Standard 6.81(b).
In contrast to these standards establishing a baseline of suspension, the majority’s sanction analysis relies on In re White, 08-1390 (La.12/02/08), 996 So.2d 266, 274, in which this court determined a lawyer’s ex parte communications fell within a baseline sanction of disbarment. The majority presently describes our analysis in In re White as turning on the fact that the ex parte communication was “about seafood pricing information.” In re McCool, No. 15-0284, op. at 1083 (La.06/30/15). While it is true that seafood prices were one topic of the lawyer’s ex parte communications in In re White, the majority presently fails to mention that the seafood pricing information supplied by the lawyer was stipulated to be “relatively useless” to the judge and, therefore, our finding in In re White that the baseline sanction for certain ex parte communications was disbarment actually rested on the lawyer engag-. ing in other communications. In re White, 08-1390 at 7, 996 So.2d at 270. To benefit his employer in a pending domestic dispute case, the lawyer engaged in ex parte communications to arrange for providing lavish gifts to a judge and his family. Id. at 7-8, 996 So.2d at 270-71. Specifically, the lawyer stipulated to the following ex parte communications with Judge Bodenheimer, which were found to have been made with the intent to benefit the lawyer’s client, restauranteur A1 Copeland:
14. During the course of the Copeland/Hunter domestic relations proceedings, Bodenheimer requested and respondent provided complimentary appetizers and refreshments at one of Copeland’s restaurants to Bodenheimer’s daughter for a birthday. Although it was (and is) a regular and common practice of Copeland’s restaurants to provide complimentary food and beverages to various members of the public, respondent acknowledges that he should have declined Judge Boden-heimer’s request.
15. Additionally, on another occasion, respondent provided promotional gift cards for complimentary food and refreshments at a Copeland’s | «restaurant to members of Bodenheimer’s staff during the time that the Copeland/Hunter proceedings were then pending. Although it was (and is) a regular and common practice of Copeland’s restaurants to provide complimentary food and beverages to various members of the public, respondent acknowledges that he should have declined to furnish these promotional gift cards.
In re White, 08-1390 at 7-8, 11-12, 996 So.2d at 270, 272-73.
Here, and unlike In re White, there has been no allegation that the respondent engaged in ex parte communications as part of a quid pro quo exchange to curry favor with a judge during a pending case. Aside from In re White, which plainly deals with misconduct of a more egregious nature than the misconduct here, the majority’s sanction analysis relies on cases in which this court suspended lawyers who engaged in ex parte communications. In re McCool, No. 15-0284, op. at 1082-83 (citing In re Lee, 07-2061, p. 11 (La.02/26/08), 977 So.2d 852, 858 (suspension of 6 months, all but 45 days deferred); In re Simon, 04-2947 (La.06/29/05), 913 So.3d 816, 819 (suspension of 6 months, all but 30 days deferred); In re Larvadain, 95-2090 (La.12/08/95), 664 So.2d 395 (suspension of 3 months, fully deferred); Louisiana State Bar Ass’n v. Harrington, 585 So.2d 514 (La.1990) (suspension of 18 months); and Louisiana State Bar Ass’n v. Karst, 428 So.2d 406 (La.1983) (suspension of 1 year)). To disbar the respondent here, *1089 considering the suspensions cited by the majority, reveals that disbarment is not only disproportionate to the misconduct, but is impermissibly punitive. See Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173, 1177-78 (La.1987) (noting the primary purposes of disciplinary proceedings are to maintain the high standards and integrity of the legal profession, protect the public, and to deter misconduct, rather than punish the lawyer).
The suspension of one year and one day recommended by the hearing committee, disciplinary board, and ODC is consistent with the baseline of suspension 19under the ABA Standards. I would impose the recommended suspension, with one alteration. Because the misconduct here is novel in that this court has never directly addressed an attorney’s use of social media and the internet and the ODC points to only two other states that have addressed misconduct involving improper internet postings, I would defer all but six months of the suspension subject to the condition that the suspension would be fully imposed if respondent were to commit misconduct during the period of active or deferred suspension. See In re Raspanti, 08-0954, p. 23 (La.3/17/09), 8 So.3d 526, 540 (finding as a significant mitigating factor that “we are issuing a sanction for a matter for which no one has been sanctioned previously.”).[7] The recommended suspension is also supported by the mitigating factor that respondent has no disciplinary history in over 14 years as a member of the bar.
Thus, I respectfully concur in part and dissent in part, with the opinion of the majority.

. The Rules of Professional Conduct prohibit a lawyer from utilizing others to do what a lawyer is prohibited from doing. See Rule 8.4(a).

. Although the respondent's brief relies heavily on First Amendment protections of speech, during oral argument, the respondent’s repeated comments about the possibility of losing her license to practice law tacitly recognize that a lawyer's speech is subject to regulation.

. The majority finds that the respondent's "overall conduct” constitutes misconduct by "clear and convincing evidence.” In re McCool, No. 15-0284, op. at 1075, 1078 (La.06/30/15). Thus; the majority sweeps *1087 both protected and un-protected speech into the category of sanctionable conduct.
I certainly share the majority’s concern that unfounded criticism can impede the judicial process. As one commentator also has noted, “with increasing frequency ... attacks on the judiciary ... are purely ideologically driven. This type of ‘criticism’ ... undermines the rule of law by suggesting that judges are free to ignore the relevant facts or the applicable law to reach the outcome sought by a special interest group.” Steven M. Puiszis, The Need to Protect Judicial Independence, 55 No. 4 DRI For Def. 1 (Apr.2013). Caustic though it may be, such speech even by a lawyer is protected by the First Amendment, as long as the speech does not, as it does here, contain misrepresentations or as the Supreme Court has explained, present a "substantial likelihood of material prejudice” to a case. Gentile, 501 U.S. at 1037, 111 S.Ct. 2720.

. The ODC cited unpublished disciplinary cases. It cited the public reprimand ordered in The Florida Bar v. Conway, SC08-326 (Fla.10/29/08), 2008 WL 4748577, and administered by the Florida Bar in The Florida Bar v. Sean William Conway, TFB File No. 2007-51,308(17B), available at https://www. floridabar.org/DIVADM/ME/MPDisAct.nsf/da Toc!OpenForm&AutoFramed&MFL=Sean William Conway&ICN=200751308&DAD=Public Reprimand (last visited 6/4/15).
In Conway, the lawyer maintained a website entitled "Judge Aleman’s New (illegal) ‘One-Week to prepare’ policy,” and referred to the judge throughout the website as an "EVIL UNFAIR WITCH.” Conway, TFB File No. 2007-51,308(17B). The reprimand stated: "although attorneys play an important role in exposing valid problems within the judicial system, statements impugning the integrity of a judge, when made with reckless disregard as to their truth or falsity, erode public confidence in the judicial system without assisting to publicize problems that legiti- ■ mately deserve attention.”
The ODC also cited In re: Kristine Ann Peshek, M.R.23794 (Ill.5/18/10), available at http://www.illinoiscourts.gov/SupremeCourt/ Announce/2010/05181.pdf, and accepting the petition for discipline available at http://www. iardc.org/09CH0089CM.html (last visited 6/4/15). According to the petition in Peschek, the attorney referred to a judge as "Judge Clueless” and referred to another judge as "a total a* * * * *

. Rule 3.6(a) of the Rules of Professional Conduct prohibits a lawyer from "mak[ing] an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.”

. Noting the novelty of internet blogging, one commentator suggests the rules governing the legal profession currently fail to equate blogging with an ex parte communication. See Rachel C. Lee, Symposium: Media, Justice, and the Law: Note: Ex Parte Blogging: The Legal Ethics of Supreme Court Advocacy in the Internet Era, 61 Stan. L.Rev. 1535 (April 2009). Here, respondent’s conduct, such as her online petition, went beyond the type of commentary typically associated with blogging and, as earlier noted, I have no difficulty finding that the respondent has engaged in communications which violate the Rules of Professional Conduct. However, the commentary just cited underscores that this is a developing area of the law, a reality which weighs against imposing disbarment under the facts presented.