# Supreme Court of Louisiana

The Opinions handed down on the **30th day of June, 2015**, are as follows:

**BY KNOLL, J.**:

2015-B -0284        IN RE: JOYCE NANINE MCCOOL

Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral arguments, it is ordered that Joyce Nanine McCool, Louisiana Bar Number 27026, be and hereby is disbarred. Her name shall be stricken from the roll of attorneys and her license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Louisiana Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this Court's judgment until paid.

WEIMER, J., concurs in part and dissents in part and assigns reasons.
GUIDRY, J., concurs in part and dissents in part.
CRICHTON, J., additionally concurs and assigns reasons.
CANNELLA, J., concurring in part and dissenting in part.

# SUPREME COURT OF LOUISIANA

# NO. 2015-B-0284

# IN RE: JOYCE NANINE MCCOOL

# ATTORNEY DISCIPLINARY PROCEEDING

**KNOLL, Justice**[*]

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Joyce Nanine McCool,[1] an attorney licensed to practice law in Louisiana.

## UNDERLYING FACTS

The underlying facts of this case are rather complex. By way of background, respondent was friends with Raven Skye Boyd Maurer ("Raven"). Following Raven's divorce in 2006, she and her former husband were involved in a bitter child custody dispute. Raven accused her ex-husband of sexually abusing their two young daughters, H. and Z.,[2] and unsuccessfully sought to terminate his parental rights in proceedings pending in Mississippi before Judge Deborah Gambrell.[3] Respondent is not admitted to the Mississippi Bar and was not admitted *pro hac vice* in Raven's Mississippi case, but she did offer assistance to Raven as a friend.

---

[*] Retired Judge James L. Cannella, assigned as Justice ad hoc, sitting for Hughes, J., recused.

[1] Respondent, a Mandeville attorney, is 52 years of age and was admitted to the practice of law in Louisiana in 2000.

[2] The children's names have been redacted from the record of this matter and only their initials are used to protect and maintain their privacy. All phone numbers and addresses for social media and internet sites have been redacted as well to further ensure their privacy.

[3] To date, no law enforcement agency or court has found any merit to the serious allegations made against Raven's former husband.

Meanwhile, respondent filed a petition in St. Tammany Parish on behalf of Raven's new husband, who sought to adopt H. and Z. The presiding judge, Judge Dawn Amacker, stayed the intrafamily adoption proceedings pending resolution of the Mississippi matter. Judge Amacker also declined to exercise subject matter jurisdiction in response to a motion for emergency custody filed by respondent on Raven's behalf. After Judge Amacker issued her ruling declining to exercise subject matter jurisdiction, respondent filed a writ application with the First Circuit Court of Appeal, which was denied.[4] On August 31, 2011, this Court likewise denied writs. *Maurer v. Boyd*, 11-1787 (La. 8/31/11), 68 So. 3d 517.

Unhappy with the various rulings made by Judge Gambrell and Judge Amacker and believing those rulings were legally wrong, respondent drafted an online petition entitled "Justice for [H] and [Z]" which she and Raven posted on the internet at change.org, along with a photo of the two girls. With regard to the Mississippi proceeding before Judge Gambrell, the online petition stated:

> To Judge Deborah Gambrell, we, the undersigned, ask that you renounce jurisdiction in this matter to the Louisiana court because the children have lived exclusively in Louisiana for the past three years. Their schools, teachers, physicians, therapists, little sister and brother and the vast majority of significant contacts are now in Louisiana. There is also an adoption proceeding pending in Louisiana over which Louisiana has jurisdiction and in the interest of judicial economy, and the best interest of the girls, Louisiana is the more appropriate forum to oversee ensure [sic] the "best interest" of the girls are protected. If you refuse to relinquish jurisdiction to Louisiana, we insist that you remove the Guardian Ad Litem currently assigned to the case, and replace him with one that has the proper training and experience in investigating allegations of child sexual abuse in custody proceedings. We further insist that, in keeping [with] S.G. v. D.C. 13 So. 3d. 269 (Miss. 2009), you specifically define the Guardian Ad Litem's role in the suit; require the new Guardian Ad Litem [to] prepare a written report; require that the report

---

[4] In denying Raven's writ application, the court of appeal, with a panel composed of Judges Guidry, Pettigrew, and Welch, stated: "[o]n the showing made, we find no error."

2

be shared with all parties prior to a hearing; that all proceeding be conducted on the record, with advance notice and opportunity to be heard, and that an evidentiary hearing be conducted to review the allegations of child sexual abuse, and that no visitation be allowed until you have seen all of the evidence.

As to Judge Amacker and the Louisiana proceedings, the petition stated:

To Judge Amacker, we, the undersigned, insist that you withdraw the unlawful stay of the adoption proceedings currently pending in your court, and, in accordance with La.Ch.C. art. 1253, a hearing be set with all due speed to allow the girls' stepfather to show why it is in the girls' best interest that they be adopted by him, thereby terminating all parental rights of the girls' biological father.

Respondent re-posted the online petition on her blog site and in online articles she authored, one of which again included a photo of the two girls. She provided contact information for the judges' offices and this Court, and added comments in which she solicited and encouraged others to express their feelings to the judges and this Court about the pending cases:

In spite of overwhelming evidence that the girls have been abused by their father, the judge in Mississippi, Judge Deborah Gambrell, of the Chancery Court of Marion County, Mississippi, refuses to even look at the evidence, and has now ordered the girls be sent to unsupervised visitation with their father.

Judge Dawn Amacker, in the 22nd JDC, Division L, for the Parish of St. Tammany in Louisiana also refused to protect the girls, even though she has the power and authority to protect them. RM now has an application to the LA supreme court, asking that it order Judge Amacker to protect the children.

Insist that Judge Amacker and Judge Gambrell do their jobs! If you want more info, go to [website] and read the writ application to the LA supreme court.

Please sign the petition, circulate it to all of your friends and families and call Judge Amacker and Judge Gambrell during the hours of 8:30 to 5:00 starting Monday, August 15 to ask why they won't follow the law and protect these children. Let them know you're watching and expect them to do their job and most of all, make sure these precious little girls are safe!

3

> Call the Louisiana Supreme Court and tell them you want the law to protect these girls [phone number]. [A]sk about the writ pending that was filed by attorney Nanine McCool on Friday, August 12, 2011.
>
> Let's turn this around and be [H's] hero. Please sign the Care2 petition and continue to call Judge Gambrell to ask her why she is unwilling to afford [H] and [Z] simple justice.
>
> You can sign the petition and lend your voice to this cause here. Or, you can contact directly. Contact information is: [provided contact information for the judges].

In response to the postings made by respondent, on August 14, 2011—two days prior to a hearing in Mississippi on Raven's motion for contempt and to terminate her former husband's parental rights—Judge Gambrell's staff received an e-mail from Heather Lyons, a signer of the online petition. Ms. Lyons stated she lived and voted in Forrest County, Mississippi, and she would "be paying attention" to Raven's case "due to the fact that Judge Gambrell refused to hear evidence of abuse in the case of little girls who are likely being molested by their father. She has an obligation to protect our most vulnerable children. Please do not let them down judge!"

A copy of the online petition and comments thereto was then filed with the Marion County Chancery Clerk of Court's Office ("Marion County Court") and faxed directly to Judge Amacker's office in Louisiana, apparently by Raven or her mother. On August 22, 2011, Judge Amacker had her administrative assistant return the petition to respondent with instructions respondent caution her client against *ex parte* communications with the judge.

Undaunted, respondent continued her online and social media campaign, further disseminating the sexual abuse allegations and even going so far as to link

4

the audio recordings in which Raven and her children discussed the alleged abuse.[5]

Respondent also stated (falsely) that no judge had ever heard these recordings because Judge Gambrell refused to allow the recordings into evidence and Judge Amacker refused to conduct a hearing:

> Listen to their 1st disclosure to Raven: [link to recording] and a day later, their second: [link to recording]
>
> Now consider that no judge has ever heard those recordings. Why? Because for 4.5 years, the judges have simply refuse [sic] to do so. On August 16, 2011, Judge Deborah Gambrell in the Chancery Court of Marion County, Mississippi, once again refused to admit all of Raven's evidence, including these recordings, and ordered that [H] and [Z] have visits with their father in the house where they both report having been molested by their father in the past.
>
> Judge Dawn Amacker in the 22nd Judicial District Court for the Parish of St. Tammany in Louisiana is also refusing to hear any evidence or to protect [H] and [Z], even though the law requires her to have a hearing and to take evidence.
>
> Their dad keeps calling them liars and saying that their mom is making them say it. All their mom wants is for a judge to look at ALL the evidence and THEN decide who to believe. Don't you think Judge Gambrell and Judge Amacker should look at the evidence before they make [H] and [Z] go back to their father's house where there is no one to protect them except the person they are most afraid of?
>
> [H] still loves her daddy. She just wants him to stop doing what he is doing to her. She does not feel safe with him alone. She said as much in her journal, but Judge Gambrell refused to allow it as evidence and Judge Amacker just ignored her.
>
> Sign our petition telling the judges that there can be no justice for [H] and [Z], or any child, if the law and evidence is ignored. Tell them they must look at the

---

[5] Pursuant to a September 2, 2008 Agreed Judgment in the Mississippi case, the parties agreed and were ordered not to disclose any audio or video recordings of the minor children to anyone except counsel of record and the court, and not to make said recordings available to anyone except the appropriate investigatory agencies at their request. Respondent argues the Agreed Judgment does not bind her because she is not a party to the Mississippi proceeding, or counsel in the proceeding, or even an attorney licensed to practice law in Mississippi.

evidence before they make a decision that will affect the rest of [H] and [Z]'s lives. Ask yourself, what if these were your daughters?

Have questions want to do more to help? Email us at [address] and someone will respond within 24 hours. Want to see more, go to [website] and read the writ submitted to the Louisiana Supreme Court on August 12, 2011.

Horrified? Call the judges and let them know: [contact information provided]

Respondent also used her personal Twitter account to promote the online petition and to otherwise draw attention to the audio recordings and the manner in which the judges were handling the cases. On August 16, 2011, the day of the Mississippi hearing, respondent tweeted 30 messages about the case and petition, including:

I realize most of u think the courts care about kids but too often there's no walk to go with the talk: [link to online petition].

Shouldn't judges base decisions about kids on evidence?: [link to online petition].

GIMME GIMME GIMME Evidence! Want some? I got it. Think u can convince a judge to look at it? Sign this petition: [link to online petition].

Judges are supposed to know shit about … the law … aren't they. And like evidence and shit? Due process? [link to online petition].

I am SO going 2 have 2 change jobs after this …! I'm risking sanctions by the LA supreme court; u could be a HUGE help.

The very next day, she tweeted: "Make judges protect [H] and [Z] from abuse by their father!: [link to online petition]."

On August 24, 2011, respondent tweeted a local investigative news organization should "focus ur lens on Y Judge Amacker won't protect these girls…" and "ask Judge Amacker why she won't listen." Respondent also provided links to the audio recordings and the online petition in numerous tweets,

6

asking various national news/media outlets and celebrities from *Dateline* to Oprah inquire "why 2 girls can't get a judge to listen to this." Another tweet said, "Judge Gambrell at it again – turned a 4 YO child over to a validated abuser – PLEASE TELL ME WHAT IT WILL TAKE FOR EVERYON [sic] TO SAY 'ENOUGH'."

These online articles and postings by respondent contain numerous false, misleading, and inflammatory statements about the manner in which Judge Gambrell and Judge Amacker were handling the pending cases. But respondent denies any responsibility for these misstatements, contending these were "Raven's perceptions of what had happened" and respondent was simply "helping [Raven] get her voice out there." For example:

- In an article entitled "Make Louisiana and Mississippi Courts Protect HB and ZB!" it is alleged the children were being sexually abused by their father and in spite of "overwhelming" evidence, Judge Gambrell "refuses to even look at the evidence, and has now ordered the girls be sent to unsupervised visitation with their father." This allegation refers to journals written by H., which Judge Gambrell excluded from evidence. Judge Gambrell gave reasons for her evidentiary rulings, but in any event, she did not simply "refuse" to look at the evidence. As for Judge Amacker, it is alleged she "refused to protect the girls, even though she has the power and authority to protect them." Judge Amacker did not refuse to protect the minor children, but rather, she stayed proceedings in Louisiana because related proceedings were already pending in Mississippi.

- In an article entitled "Justice for [H] and [Z]," it was alleged the children were being sexually abused by their father, and the children's mother had evidence of the abuse, including an audio recording and video evidence, but this evidence "was excluded from consideration on one legal technicality or another" by Judge Gambrell. Once again, Judge Gambrell's evidentiary rulings were not arbitrary or capricious. She gave reasons for her evidentiary rulings and did not simply "refuse" to look at the evidence.

7

- In a posting on her online blog, respondent linked to audio recordings of the minor children speaking to their mother about alleged sexual abuse by their father, contrary to the September 2, 2008 Agreed Judgment in the Mississippi proceedings. *See supra*, note 5.  Respondent's blog stated no judge had ever heard the recordings because "for 4.5 years, the judges have simply refuse [sic] to do so.  On August 16, 2011, Judge Deborah Gambrell in the Chancery Court of Marion County, Mississippi once again refused to admit all of Raven's evidence, including these recordings, and ordered that [H] and [Z] have visits with their father in the house where they both report having been molested by their father in the past."  However, respondent later acknowledged the audio recordings were not offered into evidence at the August 16, 2011 hearing.  In fact, the audio recordings were not even brought to court that day.  Furthermore, the audio recordings have *never* been offered into evidence in any proceeding before Judge Gambrell.  In the same blog, respondent stated Judge Amacker "is also refusing to hear any evidence or to protect [H] and [Z], even though the law requires her to have a hearing and to take evidence."  However, Judge Amacker did not refuse to have a hearing; she declined to exercise jurisdiction because related domestic proceedings were already pending in Mississippi.  Judge Amacker's ruling was upheld when both the court of appeal and this Court denied writs. *Maurer*, *supra.*

Subsequently, respondent filed motions to recuse Judge Amacker in two matters unrelated to Raven's case.  In response, Judge Amacker signed orders stating she was "voluntarily recus[ing herself] due to the possibility that the judge may be called as a witness" in disciplinary proceedings against respondent, "and out of an abundance of caution and to avoid the appearance of impropriety."  Notwithstanding the judge's stated reasons for her recusal, respondent filed two more motions for recusal in which she stated Judge Amacker had "voluntarily and *expressly admitted [her] extreme bias and conflict in recusing [herself]* in several

other cases, which grounds are equally applicable in the case at bar." [Emphasis added.] Respondent testified this was not an untruthful statement because in her view, the mere fact Judge Amacker had voluntarily recused herself was an express admission by Judge Amacker of bias against her. She also noted Judge Amacker had not denied any of the allegations respondent made in the motions to recuse, nor did Judge Amacker impose sanctions against her or file a disciplinary complaint against her. These facts further reinforced respondent's view Judge Amacker had admitted being biased against her.

On September 14, 2011, Judge Gambrell signed an order commanding respondent to appear before the Marion County Court on October 5, 2011, to show cause why she should not be held in contempt of court by disclosing information from a "sealed" record. Respondent received a copy of the notice of the contempt hearing by regular United States mail; however, she did not appear, contending she was not properly served and the Mississippi court did not have jurisdiction over her. On October 6, 2011, Judge Gambrell signed an order holding respondent in contempt of court. In October 2012, Judge Gambrell rescinded the order of contempt because "service of process was insufficient … and though violations of this Court's order relating to disclosure of audio transcriptions may have taken place, the Court is without authority to hold said Joyce Nanine McCool in contempt of this Court." In January 2013, Judge Gambrell *sua sponte* recused herself from further action in Raven's case "in accordance with the Mississippi Code of Judicial Conduct Canon 3 and to avoid the appearance of impropriety or bias."

## DISCIPLINARY PROCEEDINGS

In September 2011, Judge Gambrell filed a complaint against respondent with the ODC. Judge Amacker also provided information in connection with the ODC's investigation. In May 2014, the ODC filed one count of formal charges

9

against respondent, alleging her conduct as set forth above violated Rules 3.5(a)(a lawyer shall not seek to influence a judge by means prohibited by law), 3.5(b)(a lawyer shall not communicate *ex parte* with a judge during the proceeding), 8.4(a)(it is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another), 8.4(c)(it is professional misconduct for a lawyer to engage in dishonesty, fraud, deceit, or misrepresentation), and 8.4(d)(it is professional misconduct for a lawyer to engage in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct.

Respondent answered the formal charges by denying any misconduct and asserting her actions are protected by the First Amendment. In her pre-hearing memorandum, respondent admitted she "did implore the electorate to communicate accountability to its elected judges" and "asked publically [sic] elected judges to 'look at the evidence,' 'protect children,' and 'apply the law',", but she denied this constituted ethical misconduct. Respondent also filed an exception of vagueness and a motion for more specific allegations of misconduct. The ODC opposed the exception and motion, arguing the formal charges give respondent fair and adequate notice of the alleged misconduct. Following a telephone conference conducted on December 11, 2013, the chair of the hearing committee denied the exception and motion.

On January 10, 2014, respondent directed discovery to the ODC seeking a listing of each and every specific act or omission, which the ODC alleged to constitute a violation of the Rules of Professional Conduct, the date of each and every such act or omission, and the specific Rule purportedly violated by each such act or omission. The ODC responded to the discovery request, but refused to provide any additional information, noting the chair's previous ruling denying the exception of vagueness and the motion for more specific allegations of

10

misconduct. Respondent then filed a motion to compel the ODC to provide the requested information. Following a telephone conference conducted on February 11, 2014, the chair denied the motion to compel. Consequently, respondent filed a petition for writ of mandamus in this Court, seeking to compel the ODC to provide more specific details of the alleged misconduct set forth in the formal charges. She also sought a stay of the hearing on the formal charges set for February 27, 2014. We denied respondent's writ and her request for a stay on February 21, 2014. *In re: McCool*, 14-0366 (La. 2/21/14), 133 So.3d 669 (Hughes, J., recused).

*Formal Hearing*

The hearing committee conducted a two-day hearing on February 27, 2014, and March 27, 2014. Therein, the ODC called Judge Amacker and Judge Gambrell to testify before the committee. Respondent testified on her own behalf and was cross-examined by the ODC. During her testimony, respondent repeatedly denied she violated the Rules of Professional Conduct. Instead, she suggested her conduct was justified by what the judges had done in the underlying cases and in the interest of protecting the minor children:

> Q. What does the law say, if anything, you can do after [the Supreme Court denies writs]? I mean you've exhausted what the law allows you to do. What is your recourse then under the law?
>
> A. Weep for the children.
>
> Q. Okay. Can you cite me a law that says you can take to an online campaign to try to get the Judge's [sic] to change their mind?
>
> A. This is the United States of America. The land of the free. The home of the brave. Cite me a law that says I can't.
>
> Q. The rules that you are charged with are in the formal charges.
>
> A. They do not say that I can't take − I cannot assist a client to craft an online petition seeking whatever help

11

she can to protect her children because the legal system absolutely failed her –

Q. Ms. McCool –

A. – because the Judge's [sic] and the processes will not follow the law, will not obey the law, but hold us to the letter of the law.

*Hearing Committee Report*

After considering the evidence and testimony presented at the hearing, the hearing committee made factual findings generally consistent with the facts set forth above. Based on these facts, the committee determined respondent violated the Rules of Professional Conduct as follows:

Rules 3.5(a), 3.5(b), and 8.4(a) – Respondent used the internet, an online petition, and social media to spread information, some of which was false, misleading, and inflammatory, about Judge Gambrell's and Judge Amacker's handling of and rulings in pending litigation. Respondent circulated contact information for Judge Gambrell and Judge Amacker and solicited and encouraged others to make direct, *ex parte* contact with the judges to express their feelings about the pending cases, and attempted to influence the outcome of the pending cases. The clear intent of respondent's online campaign was an attempt to influence the judges' future rulings in the respective cases, and to do so through improper *ex parte* communication directed at the judges.

Rule 8.4(c) – Respondent disseminated false, misleading, and inflammatory information on the internet and through social media about Judge Gambrell and Judge Amacker and their handling of these pending domestic proceedings. She also instructed others to sign and circulate an online petition, and to call the judges and let them know they are "watching" them and are "horrified" by their rulings. Finally, respondent made blatantly false statements about Judge Amacker in multiple motions to recuse.

Rule 8.4(d) – Respondent used the internet and social media in an effort to influence Judge Gambrell's and Judge Amacker's future rulings in pending litigation. Respondent's conduct threatened the integrity and independence of the court and was clearly prejudicial to the administration of justice. Respondent also used her Twitter account to publish tweets linking the audio recordings of the minor children discussing alleged sexual abuse; to publish false, misleading, and inflammatory information about Judge Gambrell and Judge Amacker; and to promote the online petition, all of which was designed to intimidate and influence the judges' future rulings in the underlying proceedings.

The committee determined respondent violated a duty owed to the public and the legal system. She acted knowingly, if not intentionally. She caused actual and potential harm by threatening the independence and integrity of the judicial system, and causing the judges concern for their personal safety and well-being. The applicable baseline sanctions, therefore, range from suspension to disbarment.

In aggravation, the committee found a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law (admitted 2000). In mitigation, the committee found respondent has no prior disciplinary record.

Considering this Court's prior jurisprudence addressing similar misconduct, the committee recommended respondent be suspended from the practice of law for one year and one day. The committee further recommended respondent be required to attend the Louisiana State Bar Association's Ethics School ("Ethics School") and assessed with the costs and expenses of this proceeding.

Respondent filed a brief with the disciplinary board objecting to the hearing committee's report and recommendation.

*Disciplinary Board Recommendation*

After review, the disciplinary board determined the hearing committee's factual findings are supported by the record and are not manifestly erroneous. Based on these facts, the board agreed the committee correctly applied the Rules of Professional Conduct to the facts, except the board declined to find respondent engaged in *ex parte* communications with a judge, in violation of Rule 3.5(b). The board reasoned respondent did not have direct contact with either Judge Gambrell or Judge Amacker, and thus, no violation of Rule 3.5(b) occurred. Nevertheless, by circulating contact information for the judges and soliciting non-lawyer members of the public to make direct contact with the judges regarding a matter pending before them, respondent encouraged the public to do what she is forbidden to do by Rule 3.5(b). As such, she violated Rule 8.4(a) by attempting to communicate with Judge Gambrell and Judge Amacker "through the acts of another."

By her own admission, respondent was unhappy with the decisions rendered in the matters she was litigating. After her legal options were exhausted, she decided to launch a social media campaign to influence the presiding judges. Consequently, respondent knowingly, if not intentionally, spearheaded a social media blitz in an attempt to influence the judiciary.

The board determined respondent violated duties owed to the public and the legal system by making false, misleading, and inflammatory statements about two judges. She did so as part of a pattern of conduct intended to influence the judges' future rulings in pending litigation. Considering the ABA's *Standards for Imposing Lawyer Sanctions* ("ABA Standards"), the board determined the baseline sanction is suspension.

In aggravation, the board found a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the

14

conduct, and substantial experience in the practice of law. In mitigation, the board found respondent has no prior disciplinary record.

After further considering respondent's misconduct in light of this Court's prior jurisprudence, the board adopted the committee's recommendation respondent be suspended from the practice of law for one year and one day, required to attend Ethics School, and assessed with the costs and expenses of this proceeding.

Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Louisiana Supreme Court Rule XIX, § 11(G)(1)(b).

## DISCUSSION

Bar disciplinary matters come within the exclusive original jurisdiction of this Court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. La. Sup. Ct. R. XIX, § 11(G); *In re: Banks*, 09-1212, p. 10 (La. 10/2/09), 18 So.3d 57, 63. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *Banks*, 09-1212 at p. 10, 18 So.3d at 63; *see also In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So.2d 714.

At the outset, we note the ODC's formal charges in this case are somewhat confusing. Rather than separating out the allegations and rule violations into multiple counts, the ODC chose to combine all the factual allegations into a single count spanning eighteen pages. In an effort to clarify the matter, we have divided the allegations into three broad categories: (1) improper *ex parte* communications; (2) dissemination of false and misleading information; and (3) conduct prejudicial to the administration of justice. We will address each category in turn.

15

*Improper Ex Parte Communication*

The ODC's allegations in this area relate to respondent's use of the internet and social media to disseminate information about the manner in which Judge Gambrell and Judge Amacker handled the child custody and visitation cases at issue, in an apparent attempt to marshal public opinion against these judges and attention from this Court. According to the ODC, this conduct violated Rules 3.5(a) and (b) and Rule 8.4(a) of the Rules of Professional Conduct.

Rule 3.5 provides:

> A lawyer shall not:
>
> (a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
> (b) communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order;

Rule 8.4(a) provides:

> It is professional misconduct for a lawyer to:
>
> Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

The ODC alleges respondent violated these rules by using "the internet and social media to elicit outrage in the general public and to encourage others to make direct contact with judges in an effort to influence their handling of pending cases." Respondent, however, takes the position her comments were only intended to encourage the public to remind the judges to do justice in this case by listening to the evidence and applying the law. Nonetheless, the hearing committee made a finding of fact that respondent's clear intent was to influence the judges' future rulings in this case through *ex parte* communication directed specifically at the judges. In support, the committee cited the following examples of respondent's actions:

• Please sign the petition, circulate it to all of your friends and families and call Judge Amacker and Judge Gambrell during the hours of 8:30 to 5:00 starting Monday, August 15 to ask why they won't follow the law and protect these children. Let them know you're watching and expect them to do their job and most of all, make sure these precious little girls are safe!

• Call the Louisiana Supreme Court and tell them you want the law to protect these girls? [phone number] [A]sk about the writ pending that was filed by attorney Nanine McCool on Friday, August 12, 2011.)

• Let's turn this around and be [H's] hero. Please sign the Care2 petition and continue to call Judge Gambrell to ask her why she is unwilling to afford [H] and [Z] simple justice.

• You can sign the petition and lend your voice to this cause here. Or, you can contact directly. Contact information is: [provided contact information for the judges and their staff].

• Sign our petition telling the judges that there can be no justice for [H] and [Z], or any child, if the law and evidence is ignored. Tell them they must look at the evidence before they make a decision that will affect the rest of [H] and [Z's] lives. Ask yourself, what if these were your daughters?... Horrified? Call the judges and let them know.

We agree the examples clearly and convincingly establish respondent solicited the public to contact the presiding judges and this Court. Although respondent asserts "the admonitions in the petitions did nothing other than ensure that both parties would receive the same treatment—a hearing based on the law and evidence," the evidence shows she used the internet and social media to solicit and encourage others to make direct, *ex parte* contact with Judge Gambrell, Judge Amacker, and this Court in an effort to influence their and our decisions in sealed, pending domestic litigations.

Moreover, when the petition was printed and faxed to the Marion County Court and Judge Amacker's office, it became *ex parte* communication between the

judiciary and all signatories just as if it were a signed letter. And the first signatory on both printed petitions was respondent: "1. Nanine McCool Lacombe, LA."

Although not directly responsible for its delivery, respondent, by signing the petition, "lent her voice to the cause" along with the rest of the signatories, making the petition her own and, in turn, communicating directly to the judges and this Court, in its entirety:

> LA Supreme Court; Judge Dawn Amacker; Judge Deborah Gambrell
>
> We, the undersigned, insist that you ensure that the two little girls who are the subject of the case [], pending in the 22nd JDC, St. Tammany Parish Louisiana, and the case [], pending in the Chancery Court of Marion County Mississippi, are afforded all legal protections, including a full evidentiary hearing, to ensure that they are protected from abuse.
>
> To the Louisiana Supreme Court, we, the undersigned, ask that you issue emergency writs, ordering the courts below to exercise emergency jurisdiction over the two small girls until, based on all the evidence available, it is established by clear and convincing evidence, that the little girls subject to these proceedings are being protected from further abuse, including ordering the Hon. Dawn Amacker, Judge, Division L, 22nd JDC, Parish of St. Tammany, to lift the unlawful stay of the adoption proceedings and to set an evidentiary hearing at all due speed, allowing the girls' stepfather to show why it is in the girls' best interest that he be allowed to adopt them.
>
> To Judge Amacker, we, the undersigned, insist that you withdraw the unlawful stay of the adoption proceedings currently pending in your court, and, in accordance with La.Ch.C. art. 1253, a hearing be set with all due speed to allow the girls' stepfather to show why it is in the girls' best interest that they be adopted by him, thereby terminating all parental rights of the girls' biological father.
>
> To Judge Deborah Gambrell, we, the undersigned, ask that you renounce jurisdiction in this matter to the Louisiana court because the children have lived exclusively in Louisiana for the past three years. Their schools, teachers, physicians, therapists, little sister and brother and the vast majority of significant contacts are now in Louisiana. There is also an adoption proceeding pending in Louisiana over which Louisiana has

jurisdiction and in the interest of judicial economy, and the best interest of the girls, Louisiana is the more appropriate forum to oversee ensure [sic] the "best interest" of the girls are protected. If you refuse to relinquish jurisdiction to Louisiana, we insist that you remove the Guardian Ad Litem currently assigned to the case, and replace him with one that has the proper training and experience in investigating allegations of child sexual abuse in custody proceedings. We further insist that, in keeping [with] S.G. v. D.C. 13 So. 3d 269 (Miss. 2009), you specifically define the Guardian Ad Litem's role in the suit; require the new Guardian Ad Litem [to] prepare a written report; require that the report be shared with all parties prior to a hearing; that all proceedings be conducted on the record, with advance notice and opportunity to be heard, and that an evidentiary hearing be conducted to review the allegations of child sexual abuse, and that no visitation be allowed until you have seen all of the evidence.

Thank you for your consideration and for protecting HB and ZB!

This petition is not just a communication from the electorate to its elected judges to "look at the evidence," "protect children," and "apply the law," it is a directive asking and insisting the judges and this Court:

- issue emergency writs

- order[] lower courts below exercise emergency jurisdiction

- order[] [Judge] Amacker to lift the unlawful stay

- set … a hearing at all due speed

- withdraw the unlawful stay

- terminat[e] all parental rights of the girls' biological father

- renounce jurisdiction

- remove the Guardian Ad Litem

- replace [the Guardian Ad Litem]

- define the Guardian Ad Litem's role in the suit

- require the new Guardian Ad Litem prepare a written report

19

• conduct all proceedings … on the record

　　　• conduct an evidentiary hearing … to review the allegations of child sexual abuse

　　　• disallow visitation … until [the judge] ha[s] seen all of the evidence

By its very language, the petition implores the judges to review/see "ALL" the evidence irrespective of the rules of evidence and the judges' discretionary gatekeeping function conferred therein and likewise sets forth in explicit detail the specific manner in which the petitioners want the judges and this Court to "apply" and "follow" the law—essentially a quest for mob justice or rather "trial by internet."

　　　Respondent claims her postings are not *ex parte* communication because

> first and foremost we encourage people to draw their own conclusions. We gave them the information, we gave them the evidence and we said form your own opinion, and then if you feel strongly about it share your opinion, your independent opinion of that with the judge…. But I don't consider it an ex parte communication unless I told all those people this is what you need to tell them, and I didn't.

However, the postings belie her depiction and speak for themselves:

　　　• Insist that Judge Amacker and Judge Gambrell do their jobs!

　　　• Call Judge Amacker and Judge Gambrell … to ask why they won't follow the law and protect these children.

　　　• Let them know you're watching and expect them to do their job and most of all, make sure these precious little girls are safe!

　　　• Call the Louisiana Supreme Court and tell them you want the law to protect these girls….

　　　• Continue to call Judge Gambrell to ask her why she is unwilling to afford [H] and [Z] simple justice.

　　　• Tell[] the judges that there can be no justice for [H] and [Z], or any child, if the law and evidence is ignored.

• Tell them they must look at the evidence before they make a decision that will affect the rest of [H] and [Z's] lives.

• Ask Judge Amacker why she won't listen

Just as in the petition, respondent gives explicit directives to the public on how to voice "concern" and "horror" to the presiding judges.

As to this Court, respondent repeatedly admitted she sought to bring this case to our attention through the elicited phone calls because this Court is a "policy court":

> Q. And while the writ was pending at the Supreme Court you encouraged people to call them also?
>
> A. Yes. To let them know that they were concerned because it's a Policy Court.
>
> Q. Do you still think that's appropriate conduct today for an attorney to encourage people to contact a Court and ask them and voice their opinions about pending cases?
>
> A. To – yes. I do.
>
> Q. Okay. And do you think it's perfectly okay, even today, for you to encourage that and to solicit that?
>
> A. Yes. They're elected officials. They are responsible – they are responsive and responsible to the people they serve. And if they don't know that people aren't concerned – The Supreme Court is a Policy Court. It responds to things that they believe are important social trends. So, yes, I do believe it's important that the Supreme Court be aware that this is an important issue for people in the community. And the number that was provided is the Clerk of Court's number.

We also note the petition was drafted and posted on more than one internet site when the matter was pending before this Court on writs and just days before Judge Gambrell held her first hearing in the custody matter in Mississippi on August 16, 2011. The pleas to "call Judge Amacker and Judge Gambrell during the hours of 8:30 to 5:00 starting Monday, August 15 to ask why they won't follow the law and protect these children" and "call the Louisiana Supreme Court … and

21

ask about the writ pending that was filed by [respondent]" were made, therefore, for the sole purpose of improperly influencing the courts' future rulings to gain a tactical advantage in the pending underlying litigation. In her sworn statement, respondent even explained:

> I guess I see judges as public officials. If I understand this correctly they're elected both in Mississippi and Louisiana. They answer to the public. The public has a right to tell them how they feel. And I guess – oh boy, I'm getting on a soap box now, when the judicial – when it comes to the judiciary they have such incredible immunity that they somehow feel like they don't have to answer to the public. And I feel strongly that particularly when it comes to family law that hearing from people about what's going on is a part of what will make them better judges.

As the record reveals, one of the signatories, Heather Lyons, not only emailed Judge Gambell on August 14, 2011—just two days before the August 16, 2011 hearing—she also apparently called Judge Gambell at home, "[a]ccusing [her] of being a person who supports child predators or whatever." Judge Amacker testified her office received "hundreds" of calls regarding the petitions, while Judge Gambell testified she even mentioned on the record in the August 16, 2011 hearing "that numerous people were calling and that they should not do that." Both viewed the petition as an attempt to threaten, intimidate, and/or harass them into handling the case in the manner the petitioners wanted, and they both felt threatened. Specifically, Judge Gambell explained:

> Q. Judge, did you receive any calls or view anything in the petition or these comments that we've looked at already that ever gave you any cause for concern for your personal safety?
>
> A. Yes, sir. The kind of work that we do in this court places you in a situation where somebody is going to win most of time and somebody's going to lose…. So that concerned me that all these people are being told to call me. You could easily Google map me; find out where I am and it really – I was really concerned because I had just gotten into the case and before I could even do what I needed to do, I was being harassed by phone calls and

22

> then this Twitter and all this other stuff. It did not make sense to me, but I was concerned about my safety.

When asked a similar question regarding whether she had personally received any telephone calls, Judge Amacker responded:

> Let me see if I can break that down just to be accurate. I – no. We have things put in place at our offices that no one ever gets to me as the Judge without it first being vetted through usually my secretary and my staff attorney. So if there's ex–parte communications that come in, and we get a lot in Family Court. You get a lot of angry people and people calling in and it happens. Those never get to the Judge.
> So I can't tell you who called, what they said, these types of things of who called in. I can say that hundreds of members of the public and attorneys have stopped by or called to let us know this was on the internet out of concern; out of concern for us. They just wanted to let my staff know or me know. Stop me on the street, in the hallway, whatever, out of concern and horror – the horrified was the public and the attorneys that saw this. And still are.

Reviewing all the evidence, we conclude the telephone calls, the email, and the faxed petitions constitute prohibited *ex parte* communication induced and/or encouraged by respondent. Coupled with her social media postings, we further conclude respondent's online activity amounted to a viral campaign to influence and intimidate the judiciary, including this Court, in pending, sealed domestic litigations by means prohibited by law and through the actions of others. Accordingly, we find the evidence clearly and convincingly shows respondent's conduct in this regard violated Rules 3.5(a) and (b) and Rule 8.4(a) of the Rules of Professional Conduct.

*Dissemination of False and Misleading Information*

The ODC alleges respondent "disseminated false, misleading and/or inflammatory information through the internet and social media about Judge Deborah Gambrell and Judge Dawn Amacker in pending cases wherein Respondent was counsel of record and/or had a personal interest." It further

alleges respondent "also made false and misleading statements in multiple motions to recuse Judge Amacker." The ODC concludes these actions violate Rule 8.4(c).

Rule 8.4(c) provides:

> It is professional misconduct for a lawyer to:
>
> (c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

In finding respondent violated this rule, the hearing committee made several specific factual findings:

(1) Respondent stated Judge Gambrell ignored "overwhelming evidence" of abuse and "refuses to even look at the evidence, and has now ordered the girls be sent to unsupervised visitation with their father." The committee found respondent's statement was a "gross mischaracterization" of the facts.

(2) Respondent stated Judge Amacker "in Louisiana also refused to protect the girls, even though she has the power and authority to protect them ..." The committee found this statement was false and inflammatory, as Judge Amacker did not refuse to protect the children, but instead stayed the Louisiana proceedings on the ground related proceedings were already pending in Mississippi.

(3) Respondent posted audio recordings of the minor children purportedly talking about abuse and stated that on August 16, 2011, Judge Gambrell "once again refused to admit all of Raven's evidence, including these recordings, and ordered that [H] and [Z] have visits with their father in the house where they both report having been molested by their father in the past." The committee found this statement was clearly false, as the tapes were not offered into evidence on August 16, 2011; therefore, Judge Gambrell could not have "refused to admit" them.

(4) Respondent stated, "Judge Dawn Amacker in the 22nd Judicial District Court for the Parish of St. Tammany in Louisiana is also refusing to hear any evidence or to protect [H] and [Z], even though the law requires her to have a hearing and to take evidence." The committee found this statement was false, because Judge Amacker had stayed the Louisiana proceedings in light of the Mississippi proceeding.

(5) Respondent stated the Louisiana court (Judge Amacker presiding) "has voluntarily and expressly admitted its extreme bias and conflict in recusing itself in two other cases, which grounds are equally applicable in the case at

24

bar." The committee found this statement was false, as Judge Amacker's judgment stated, "[t]he Court hereby voluntarily recuses itself due to the possibility that the judge may be called as a witness in the proceedings referenced by counsel, and out of an abundance of caution and to avoid the appearance of impropriety."

In her brief, respondent takes the position she did not make any knowingly false statements. While respondent acknowledges she may have made some factual mistakes, such as with regard to the admission of the audio tapes, she claims this does not amount to making an intentionally false statement. She further contends her characterization of the judges' actions in this case was not false, but simply based on her subjective analysis of their actions.

However, we find the record evidence supports the ODC's charges in this regard. Respondent's online posting and twitter feeds are littered with misrepresentations and outright false statements. Although she claims they were not made intentionally, respondent even concedes to the misrepresentations. Moreover, even after learning of the "mistakes" through her own review of the underlying records, respondent made no attempt to remedy them, but merely took the position they were her client's subject view of the proceedings, raising the level of her continuous posting and twitter conduct from a simple mischaracterization into a knowing and arguably intentional dissemination of false information. This is particularly true regarding the judges' "refusal" to "hear," "view," or "admit" evidence, namely the audio recordings, which were never offered into evidence at any proceeding before either Judge Gambrell or Judge Amacker.

Regarding the recusal notices, the signed orders of recusal contain no express admissions of "extreme bias." Respondent attempts to excuse her statements as merely her subjective interpretation of Judge Amacker's action in recusing herself, arguing the recusal itself is an expression of bias. Moreover, she styles her motion to recuse a pleading, casting Judge Amacker as the adverse party,

and argues that by not outright denying the allegations therein, Judge Amacker essentially admitted to the extreme bias. Rather than an answer, however, Judge Amacker's recusal is an order of the court, and as well established, those matters not expressly granted in a judgment or order of a court are considered denied. *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, p. 12 (La. 7/1/08), 998 So.2d 16, 26 (relief sought presumed denied when judgment silent as to claim or demand). Accordingly, we find the evidence clearly and convincingly shows respondent's repeated false statements concerning Judge Amacker's "expressly admitted extreme bias" were not mere misrepresentations, but false statements knowingly and intentionally made. Accordingly, we find the evidence clearly and convincingly shows a violation of Rule 8.4(c) of the Rules of Professional Conduct.

*Conduct Prejudicial to the Administration of Justice*

Lastly, the ODC alleges respondent's overall conduct – utilizing the internet and social media both in an attempt to influence the judges and to expedite achievement of her goals in the case – was prejudicial to the administration of justice and violated Rule 8.4(d).

Rule 8.4(d) provides:

It is professional misconduct for a lawyer to:

(d) Engage in conduct that is prejudicial to the administration of justice.

In determining respondent violated this rule, the hearing committee found:

Respondent used the internet and social media in an effort to influence Judge Gambrell's and Judge Amacker's future rulings in pending litigation. Respondent's conduct threatened the independence and integrity of the court and was clearly prejudicial to the administration of justice.

Respondent also used her Twitter account to publish multiple tweets linking the audio recordings of the minor children discussing alleged sexual abuse; to publish false,

26

misleading and inflammatory information about Judge Gambrell and Judge Amacker, and to promote the online petition, all of which was designed to intimidate and influence the judges' future rulings in the underlying proceedings.

Respondent knowingly if not intentionally embarked on a campaign using internet, social media and *ex parte* communication specifically designed to intimidate and to influence the judges' future rulings in pending litigation. Her online campaign to influence judges in pending litigation threatened the independence and integrity of the judiciary. Respondent's conduct also caused the judges concern for their personal safety.

In her brief, respondent asserts there is no evidence any of her statements were intended to be intimidating or threatening to the judges. Rather, she claims her statements were within the scope of the First Amendment and were intended to "encourage the public, to extoll their elected judges to do justice, listen to the evidence, apply the law, and protect children."

We disagree and take strong exception to respondent's artful attempt to use the First Amendment as a shield against her clearly and convincingly proven ethical misconduct. As the United States Supreme Court noted in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720 (1991):

> It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. *Sacher v. United States*, 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952) (criminal trial); *Fisher v. Pace*, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949) (civil trial). Even outside the courtroom, a majority of the Court in two separate opinions in the case of *In re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. There, the Court had before it an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. The plurality opinion, which found the discipline improper, concluded that the comments had not in fact impugned the judge's integrity. Justice Stewart, who provided the fifth vote for

reversal of the sanction, said in his separate opinion that he could not join any possible "intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct." *Id*., at 646, 79 S.Ct., at 1388. He said that "[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *Id*., at 646-647, 79 S.Ct., at 1388-1389. The four dissenting Justices who would have sustained the discipline said:

> "Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer.
>
> . . . . .
>
> "He is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." *Id*., at 666, 668, 79 S.Ct., at 1398, 1399 (Frankfurter, J., dissenting, joined by Clark, Harlan, and Whittaker, JJ.).

Likewise, in *Sheppard v. Maxwell*, where the defendant's conviction was overturned because extensive prejudicial pretrial publicity had denied the defendant a fair trial, we held that a new trial was a remedy for such publicity, but

> "we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. *Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures*." 384 U.S., at 363, 86 S.Ct., at 1522 (emphasis added).

. . . . .

We think that the quoted statements from our opinions in *In re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959), and *Sheppard v. Maxwell*, *supra*, rather plainly indicate that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and the cases which preceded it. Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct. As noted by Justice Brennan in his concurring opinion in *Nebraska Press*, which was joined by Justices Stewart and Marshall, "[a]s officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice." *Id.*, at 601, n. 27, 96 S.Ct., at 2823, n. 27. Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative. *See, e.g., In re Hinds*, 90 N.J. 604, 627, 449 A.2d 483, 496 (1982) (statements by attorneys of record relating to the case "are likely to be considered knowledgeable, reliable and true" because of attorneys' unique access to information); *In re Rachmiel*, 90 N.J. 646, 656, 449 A.2d 505, 511 (N.J.1982) (attorneys' role as advocates gives them "extraordinary power to undermine or destroy the efficacy of the criminal justice system"). We agree with the majority of the States that the "substantial likelihood of material prejudice" standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials.

*Gentile*, 501 U.S. at 1071-73, 111 S.Ct. at 2743-44.

Applying this reasoning herein, respondent, as an officer of the court, is held to a higher standard than a non-lawyer member of the public. As we stated in the matter of *In re: Thomas*, 10-0593, p. 11 (La. 6/25/10), 38 So.3d 248, 255:

An attorney is trained at law, has taken an oath, assumes a position of public trust and holds himself out to the public as being fit and capable of handling its funds and problems. The attorney has assumed a position of responsibility to the law itself and any disregard for the

law is more serious than a breach by a layman or non-lawyer. He is an officer of the Court.

By holding the privilege of a law license, respondent, along with all members of the bar, is expected to act accordingly. This is particularly so when a lawyer is actively participating in a trial, particularly an emotionally charged child custody proceeding. Respondent in this instance "is not merely a person and not even merely a lawyer. [She] is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." *See Gentile*, *supra*. And as such, her "[o]bedience to ethical precepts require[d] abstention from what in other circumstances might be constitutionally protected speech," to preserve the integrity and independence of the judicial system. *Id.*

The appropriate method for challenging a judge's decisions and evidentiary rulings, as respondent even conceded, is through the writ and appeal process, not by starting a social media blitz to influence the judges' and this Court's rulings in pending matters and then claiming immunity from discipline through the First Amendment.

Rather than protected speech, the evidence clearly and convincingly shows respondent's online and social media campaign was nothing more than an orchestrated effort to inflame the public sensibility for the sole purpose of influencing this Court and the judges presiding over the pending litigation. As such it most assuredly threatened the independence and integrity of the courts in the underlying sealed domestic matters. Moreover, the testimony irrefutably establishes both presiding judges perceived the campaign as a threat to their personal security and as an attempt to intimidate and harass them into ruling as the petitioners wanted.

We also find the ultimate result of the viral blitz was the recusal of both judges from the underlying domestic cases as well as other cases involving

respondent as counsel. As Judge Gambrell testified, to which Judge Amacker would agree:

> A Judge is a human being also and it is very difficult for me to feel that I am exercising my integrity and being independent when I'm being constantly barraged by allegations that are just completely false. It is very difficult for a Judge to make decisions without knowing that all of this intimidation and harassment is out there.
>
> It is insulting to me as an – well, I practiced law for 30 years. I'm a mother of six daughters. It would have been better for [respondent] just to drive across the state line and come sit in the court and actually see what was being done. As an advocate for the children or whatever as opposed to making these malicious attacks to the point – I think it was designed to run me from the case. Intimidate me to the point that I felt that there was no way to be fair or impartial.
>
> That's basically what it did. I tried – I've never been one to run away from doing what I've been called to do, but this was just more than I could bear. I have a family like everybody else and it just would not stop. My – I wanted to stop it at the Show Cause hearing so that I could just look at everybody and say look, this is not how we do this. Give me a chance to look at this and let everybody have access to the court system. But everybody just went on their own tears and it took away my ability to really do anything with the case.

Though not as blatantly offensive as the blitzing itself, this result nevertheless prejudiced the administration of justice by causing undue delays in numerous time sensitive matters, some of which these judges had presided over for a long period of time. Therefore, we find respondent's overall conduct in this regard was prejudicial to the administration of justice in violation of Rule 8.4(d).

Accordingly, having found the ODC has proven by clear and convincing evidence respondent's conduct violated Rule 3.5(a) and (b) and Rule 8.4(a), (c), and (d), we must determine the appropriate sanctions.

*Sanctions*

In determining a sanction, we are mindful disciplinary proceedings are not primarily to punish the lawyer, but rather are designed to maintain high standards

of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So.2d 1173, 1177-78 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So.2d 520, 524 (La. 1984).

Louisiana Supreme Court Rule XIX, § 10(C) states, in imposing a sanction after a finding of lawyer misconduct, this Court shall consider four factors:

(1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;

(2) whether the lawyer acted intentionally, knowingly, negligently;

(3) the amount of actual or potential injury caused by the lawyer's misconduct; and

(4) the existence of any aggravating or mitigating factors.

As required, we turn now to a consideration of each factor.

*Violated Duties*

As the hearing committee and disciplinary board both found, there is no question respondent's misconduct violated a duty to the legal system, as well as the public. More importantly, we find her misconduct also violated a duty to the children in the underlying domestic litigation. In child custody and abuse cases, our courts are extremely cognizant of the need to protect the identity and privacy of the children and their best interest is always at the forefront of any litigation involving their welfare. *State ex rel. S.M.W.*, 00-3277, p. 21 (La. 2/21/01), 781 So.2d 1223, 1238 ("primary concern of the courts and the State remains to secure the best interest for the child"); La. Civ. Code art. 131 (custody awarded "in accordance with the best interest of the child"); *Kieffer v. Heriard*, 221 La. 151, 160, 58 So.2d 836, 839 (1952)("well established that the paramount consideration

… is the welfare and best interest of the child"). This is why such cases are often sealed as the litigations herein were, one of which was sealed at the request of respondent. With that being said, we take umbrage with respondent's online and social media activity that not only released the names of these children, but linked their audio conversations with their mother detailing their abuse allegations and posted their faces on the world wide web for anyone to see. We find very telling in this regard the following discussion respondent had with ODC counsel in her sworn statement:

> Q. And so part of the concern is in now in Louisiana in a knowingly sealed matter because you are the one who asked it be sealed, I assume it was granted and was sealed, that now in the public arena you're discussing and complaining about those very proceedings which are sealed.
>
> A. Well, I guess my understanding of sealing records is that you would be sealing the sensitive evidence or information in the record, not the fact that the record exists itself. So we never and I would not allow the drawings that were submitted as part of that record to be made part of the social –
>
> Q. Okay.
>
> A. – you know,––
>
> Q. So the drawings and none of the excerpts from the journal, none of that was ever –
>
> A. No.
>
> Q. – linked or attached or images uploaded and connected with any of the social media sites?
>
> A. No, absolutely not.
>
> Q. Okay.
>
> A. They've very compelling images but I believe they belong to H. So I wouldn't – didn't want to do that to her.

We agree, but would also extend respondent's reasoning and concerns to the children's audio recordings, their photos, and their names, some of which are still

accessible even today. In her misguided attempt to protect the children, respondent intentionally facilitated their exposure, breaching what we would consider one of the greatest duties owed by an attorney in a domestic litigation involving minor children and allegations of sexual abuse.

*Intentional, Knowing, Negligent Action*

The ABA Standards define the terms intent, knowledge, and negligence. Intent is defined as "the conscious objective or purpose to accomplish a particular result." Knowledge is "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." Whereas negligence is "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation."

Both the hearing committee and disciplinary board found the evidence proved respondent acted knowingly if not intentionally. As to the internet and social media campaign, respondent repeatedly admitted her purpose was to increase the chance of this Court granting her writ, to "influence the judges to apply the law and look at the evidence … through whatever means available," and "to get local and national media attention on this particular case." In her sworn statement, respondent explained her reasons for employing her social media blitz:

> Q. … you've afforded yourself the appeal route although we discussed at least in the one instance where that was not, didn't give the results that y'all were still looking for.
>
> A. Correct.
>
> Q. But you understand that's how our system is set up, and you go to district court and if the ruling is wrong and or you disagree with it factually or legally and you have grounds to then you appeal and you can go up to the circuit court and to the Louisiana Supreme Court. What I don't understand is or what I'm trying to understand is

34

why the two pronged attack. I mean you know you have access to appeal Judge Amacker –

A. Uh-huh.

Q. – since that's the case you're involved in, okay, and if she's wrong to get her ruling overturned, right?

A. Right.

Q. And y'all availed yourself of that?

A. Correct.

Q. Why also then used the online slash social media attack to effect her rulings at the district court level?

A. Yeah, well, you know, my initial thing that I wanted to say was why not because we're talking about little kids here and used every available resource to try and protect them. So as a general response to your question that would be my answer as to why I would use any available and appropriate tactic to help these kids. Whether or not I thought – I mean at the moment the – I think the social pressure that, you know, we thought – because the appeal process is a long process, in the meantime the kids are being exposed, you know, and they're not being protected. So I think maybe the better answer to your question is that our concern was that even if we were successful on the appeal or the writ it was going to take a while and in fact it did. I think it took up two months, two maybe two and a half months. And even if we had been successful that would have been two and a half months where these children were being exposed to this trauma and we were just trying to do anything we could to protect them.

Q. Did you ever think that this – the kind of social media approach that there was something wrong with it or that it jeopardized you?

A. I wanted to be careful that I didn't do anything inappropriate. I understand that I'm a lawyer and that I have to protect, you know, that my – I'm very, very, very serious about my own ethics and my own intergrity. So – but, you know, I served in the military, I have a very strong sense of what it means to be a US citizens and I absolutely believe in being active and pro-active and just standing up and taking a voice. I'm standing up against what I do believe is wrong in an appropriate manner and I didn't see anything wrong with reaching out to other citizens and saying I have a problem with this, do you agree with me, and if you do come join me. I think that's

35

> just, you know, inherently American. So, no, I guess the short answer is no, did I proceed with caution, yes, I did. I had – I had to have a sit down with myself about whether or not how involved I wanted to be in drafting the petition. But after considering it, you know, Raven needed my help. She didn't, you know, she was too close to it emotionally to be coherent so I helped her shape her ideas. I helped her be more coherent in what she wanted to say. And I have no – I can't regret doing that.

We agree this evidence demonstrates both a level of intent and knowledge. As previously discussed, we likewise find the evidence demonstrates respondent acted knowingly, if not outright intentionally, in the dissemination of false information on social media/internet and in her motions to recuse as well as in her request for public action in calling the presiding judges to express concern and outrage.

Regarding the actual faxing of the petition to the Marion County Court and Judge Amacker's office, we find respondent's participation was knowingly made, *i.e.*, with "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." Without question, once respondent knowingly and intentionally signed the petition, it was published and released to anyone with access to the internet. Her act in signing an online petition directly related to a pending litigation in which she was enrolled as counsel thus rises to the level of knowledge, because although she did not fax the petition, she, given her internet and social media suavity, clearly was aware the petition she signed could and might very well be printed and sent to the judges and courts to whom the petition was addressed. Though "uncomfortable" upon learning of the fax shortly after it was sent, respondent could not admit she was surprised. And when asked if she said anything that either directed or encouraged her client to fax the petition, she conceded:

> I can't remember anything I said that was directly encourage [sic] her but I don't know that I did anything to discourage her, you know, honestly. You know, there is a lot of frustration with this case….

36

Thus, we find this evidence does demonstrate knowledge on respondent's part.

*Actual or Potential Harm*

Furthermore, we find the evidence shows respondent's conduct caused actual and potential harm to the independence and integrity of the judicial system and also caused the judges concern for their personal well-being. We also find her exposure of the children on the world wide web extremely harmful.

*Aggravating and Mitigating Factors*

After reviewing the record, we adopt the hearing committee's and disciplinary board's findings on the aggravating and mitigating factors in this case. In aggravation, we find respondent: (1) acted dishonestly and selfishly, (2) engaged in a pattern of misconduct involving multiple offenses, (3) had substantial experience in the practice of law having been admitted to the practice of law since October 2000, and, most importantly, (4) absolutely refuses to acknowledge the wrongful nature of her conduct or show any remorse for her actions. It is this utter lack of remorse that astonished this Court when she appeared before us for oral argument. Her defiant attitude as to the rules of our profession vis-à-vis her First Amendment rights was clearly evident in her response to questions posed by several members of the Court. Completely unapologetic for her misconduct, respondent made it abundantly clear she would continue to use social media and blogs to effect her agenda to bring about the changes she sought in the underlying cases. Respondent will not admit to any wrong doing whatsoever.

There can be no greater professional calling than to stand as an attorney at the bar of justice and assert as well as defend the rights of citizens. With that being said, we have long recognized the utmost importance of our rules of professional conduct to maintain and preserve the dignity and integrity of our time-honored profession. Any lawyer privileged to stand at the bar and pursue this noble

endeavor has taken an oath to abide by those rules. This Court will not tolerate respondent's defiant attitude and unapologetic actions, which make a mockery of our rules and traditions.

In imposing sanctions we also look at any mitigating factors. The only mitigating factor in this case is respondent's absence of a prior disciplinary record.

While there is no Louisiana case directly on point with the manner in which respondent facilitated her misconduct, *i.e.*, through social media and the internet, we do find the serious nature of her actions requires serious sanction. In these cases, we look to the ABA Standards for guidance in determining the baseline sanction. Under the standards relevant herein, disbarment is generally appropriate when a lawyer:

> (1) makes an ex parte communication with a judge or juror with intent to affect the outcome of the proceeding, and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceedings; or

> (2) engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

ABA Standards 6.31(b) and 5.11(b), respectively. Suspension is generally appropriate when a lawyer:

> engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding.

ABA Standard 6.32. Accordingly, the applicable baseline sanction under the ABA Standards ranges from suspension to disbarment.

Although the manner in which respondent violated the applicable rules of professional conduct is novel, the misconduct—*ex parte* communication, dissemination of false and misleading information, and conduct prejudicial to the

administration of justice—is hardly so. As both the hearing committee and disciplinary board properly noted, our prior jurisprudence provides us guidance in dealing with professional misconduct involving lawyers who engage in improper communications with and about judges and in conduct dishonest and prejudicial to the administration of justice.

For example, in the matter of *In re: White*, 08-1390, p. 14 (La. 12/02/08), 996 So.2d 266, 274, this Court held "disbarment is the applicable baseline standard for respondent's conduct in engaging in *ex parte* communications with the trial judge presiding over his client's pending domestic litigation." This Court disbarred attorney White for, among other things, his *ex parte* communication with the presiding judge, Ronald Bodenheimer, about seafood pricing information.

In the matter of *In re: Lee*, 07-2061, p. 10 (La. 02/16/08), 977 So.2d 852, 858, this Court stated "the language of Rule 3.5(b) clearly and broadly prohibits all *ex parte* communication with a judge during the course of a proceeding." The attorney therein was suspended for six months, with all but 45 days deferred, subject to the condition he attend Ethics School and obtain five additional hours of continuing legal education in professionalism, for his misconduct which included extremely vile and insulting remarks to the trial court and an *ex parte* communication with the judge during the course of a proceeding. This Court noted his behavior presented a common theme of "lack of respect for the dignity, impartiality, and authority of the district court." *Lee*, 07-2061 at p. 10, 977 So.2d at 858. And in *Louisiana State Bar Ass'n v. Harrington*, 585 So.2d 514 (La. 1990), this Court found a lawyer need not represent a party in a case to be subject to the Rule 3.5(b) proscription against *ex parte* communication and suspended an attorney for 18 months for making false statements, engaging in conduct that unduly embarrassed, delayed or burdened a third person, and engaging in improper *ex parte* communication with a judge. Considering the attorney's conduct "caused

39

no harm to his clients and his inexperience and remorse," this Court reduced the suspension to nine months on rehearing. *Harrington*, 585 So.2d at 524.

We likewise suspended an attorney for six months, with all but 30 days deferred, for making false statements about judges in a hypothetical attached to an appellate brief in which the attorney described a judge's ruling as having "violated not only controlling legal authority but the very principals [sic] (honesty and fundamental fairness) upon which our judicial system is based." *In re: Simon*, 04-2947, p. 4 (La. 6/29/05), 913 So.2d 816, 819. In the matter of *In re: Larvadain*, 95-2090 (La. 12/8/95), 664 So.2d 395, 395-96, this Court suspended a lawyer for three months, fully deferred, and placed him on unsupervised probation for one year with special conditions, for having accused the judge of being a racist while cursing him, threatening him, and attempting to intimidate him.

Notably, we also suspended an attorney for one year for accusing a judge of being "dishonest, corrupt and engaging in fraud and misconduct," and for causing his unfounded accusations to be published in the local newspaper. *Louisiana State Bar Ass'n v. Karst*, 428 So.2d 406, 408 (1983).

As these cases demonstrate, the discipline for similar misconduct corresponds with the ABA recommended baseline sanction ranging from suspension to disbarment. Respondent's misconduct is further distinguishable because of her use of the internet and social media to facilitate her misconduct. As a result, the petition and associated offensive postings had and still have the potential to reach a large number of people world-wide and remain present and accessible on the world wide web even today. Coupled with her complete lack of remorse and admitted refusal to simply allow our system of review to work without seeking outside interference, respondent's misconduct reflects a horrifying lack of respect for the dignity, impartiality, and authority of our courts and our judicial process as a whole. As noted by the United State Supreme Court:

> The vigorous advocacy we demand of the legal profession is accepted because it takes place under the neutral, dispassionate control of the judicial system. Though cost and delays undermine it in all too many cases, the American judicial trial remains one of the purest, most rational forums for the lawful determination of disputes. A profession which takes just pride in these traditions may consider them disserved if lawyers use their skills and insight to make untested allegations in the press instead of in the courtroom. But constraints of professional responsibility and societal disapproval will act as sufficient safeguards in most cases.

*Gentile*, 501 U.S. at 1058, 111 S.Ct. at 2736. Respondent's social media campaign conducted outside the sealed realm of the underlying judicial proceedings constitutes, in our view, an intolerable disservice to these traditions and our judicial system, which the constraints of our rules of professional conduct seek to safeguard against. Accordingly, we find her ethical misconduct warrants the highest of sanction—disbarment.

## DECREE

Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral arguments, it is ordered that Joyce Nanine McCool, Louisiana Bar Number 27026, be and hereby is disbarred. Her name shall be stricken from the roll of attorneys and her license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Louisiana Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this Court's judgment until paid.

**06/30/15**

# SUPREME COURT OF LOUISIANA

## NO. 2015-B-0284

## IN RE: JOYCE NANINE MCCOOL

*ATTORNEY DISCIPLINARY PROCEEDINGS*

**Weimer, J.**, concurring in part, dissenting in part.

I agree with the majority that the respondent has engaged in professional misconduct. However, I find some aspects of respondent's conduct amounted to constitutionally protected speech, for which respondent cannot be sanctioned. Furthermore, I find the majority's sanction of disbarment to be disproportional to respondent's misconduct.

The majority finds that the respondent's online and social media campaign was an orchestrated effort to inflame the public sensibility and to direct public criticism toward the judges presiding over child custody litigation in both Louisiana and Mississippi. I do not doubt this was the respondent's motivation. I also have no doubt that the respondent was wrong on several points for which she sought to have the public become incensed. Contrary to respondent's internet postings, the Mississippi judge did not ignore audio recordings of the children. Rather, the recordings were never offered into evidence in the Mississippi proceeding. Similarly, and contrary to respondent's postings, the Louisiana judge did not ignore evidence because proceedings in Louisiana were appropriately stayed in deference to the proceedings pending in Mississippi. After the Louisiana judge realized she would likely be a witness in the respondent's disciplinary proceedings, the judge recused herself "to avoid the appearance of impropriety" in two unrelated cases in which

respondent was counsel of record. However, the respondent followed this up by filing motions in two other unrelated cases in which the respondent misrepresented the judge had recused herself because of the judge's "extreme bias" against the respondent.

Making misrepresentations in court pleadings is sanctionable. The misrepresentations within the respondent's online and social media campaign and the fact that they were made by a lawyer representing the mother's custody interests are also sanctionable. See **Gentile v. State Bar of Nevada**, 501 U.S. 1030, 1038 (1991) (upholding the ability of a state supreme court to sanction an attorney who "knew or reasonably should have known his remarks created a substantial likelihood of material prejudice" to a judicial proceeding). The misrepresentations in respondent's statements justify a sanction under Rule 3.5[1] for the substantial likelihood it would prejudicially disrupt the child custody proceedings, "since lawyers' statements are likely to be received as especially authoritative." **Id.** at 1074. Also, to the extent respondent maintained internet resources, such as websites and social media, directing petitions to be sent to the Louisiana and Mississippi judges, I construe respondent's actions as sanctionable ex parte communications in violation of Rule

_____

[1] Rule 3.5 of the Louisiana Rules of Professional Conduct provides:

> A lawyer shall not:
> (a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
> (b) communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order;
> (c) communicate with a juror or prospective juror after discharge of the jury if:
> > (1) the communication is prohibited by law or court order;
> > (2) the juror has made known to the lawyer a desire not to communicate; or
> > (3) the communication involves misrepresentation, coercion, duress or harassment; or
> (d) engage in conduct intended to disrupt a tribunal.

3.5.[2]  This court's majority goes further, however, and sanctions the very acts of criticizing judges and inspiring public criticism toward judges.  In so doing, the majority impermissibly sanctions the respondent for engaging in constitutionally protected speech.

As the Court in **Gentile** explained, "[t]here is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Id.* at 1034-35.  Furthermore, "limits upon public comment about pending cases are 'likely to fall not only at a crucial time but upon the most important topics of discussion.'" *Id.* at 1035, *quoting* **Bridges v. California**, 314 U. S. 252, 268 (1941).

Indeed, because of the adversarial nature of our system of justice, criticism of judges is an expected part of the judicial system.  Criticism of judges takes place regularly by parties who perceive they have been aggrieved by judges' decisions. The appeals process actually requires parties–and the lawyers who represent them–to identify and criticize the aspects of judicial decisions with which they disagree.  Had the respondent not peppered her criticism with misrepresentations, engaged in ex parte communications, engaged in conduct designed to gain an unfair advantage in on-going litigation, and broken a court-ordered seal imposed to protect confidentiality, the respondent's online criticisms of the judges' handling of the child custody matter would likely have been fully protected speech.[3]  As the Supreme Court explained in **Bridges**, 314 U.S. at 270-71:

> The assumption that respect for the judiciary can be won by shielding
> judges from published criticism wrongly appraises the character of

---

[2]  The Rules of Professional Conduct prohibit a lawyer from utilizing others to do what a lawyer is prohibited from doing.  See Rule 8.4(a).

[3]  Although the respondent's brief relies heavily on First Amendment protections of speech, during oral argument, the respondent's repeated comments about the possibility of losing her license to practice law tacitly recognize that a lawyer's speech is subject to regulation.

American public opinion …. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

Here, the respondent perceived there to be mistreatment of her client's children and looked to the judicial system to address that mistreatment. In light of her evaluation of the situation, respondent's initial efforts to invoke judicial action were both expected and appropriate. However, as an officer of the court, a lawyer must abide by the principle that cases should be decided by careful deliberation and application of the facts to the law, not by public clamor. Therefore, after the litigation was complete, the respondent would have been entitled to disseminate appropriate criticism–on the internet if she preferred–that the courts ignored the rule of law, if her representations had been true. But they were not.

Respondent cannot even lay claim to holding a reasonable belief in the veracity of some of her most significant criticisms. As noted earlier, there was simply no evidence that the Mississippi court had ignored tape recordings, which allegedly revealed child abuse, when those recordings had never been submitted for the court's consideration. I emphasize this example, because I believe it underscores that the respondent is passionate in her belief there is a need for society to prevent child abuse. Passionate belief is usually preferable to apathy and, regarding the need for society to prevent child abuse, only an unreasonable person would argue in favor of apathy. In every given case as to whether abuse has actually occurred and must be stopped, society has chosen the courts to be the ultimate arbiters. Because respondent, in her privileged role as a lawyer, is an officer of the court, both society and the government serving it have a justified expectation that officers of the courts will temper their public criticisms with truthful statements. See **Gentile**, 501 U.S. at

4

1031 (explaining that lawyers "are key participants" in the justice system, "and the State may demand some adherence to that system's precepts in regulating their speech and conduct.").

Respondent certainly did not champion the rule of law in her handling of information relating to her client's children. Respondent sought and obtained the sealing of the record in a case dealing with the children. However, respondent later released information in violation of the seal that she had obtained from the judicial system.

Therefore, I concur with the majority inasmuch as I find discipline is warranted for respondent's misrepresentations, ex parte communications during on-going litigation, and breaking of a court-ordered seal. I dissent, however, from the majority's inclusion of respondent's acts of online criticism (apart from the impermissible content just noted) as sanctionable conduct.[4]

I further dissent as to the sanction. The Office of Disciplinary Counsel (ODC) recognizes that "[t]here is no Louisiana Jurisprudence addressing misconduct similar to Respondent's" and relies on the jurisprudence of two other states[5] to support the

---

[4]  The majority finds that the respondent's "overall conduct" constitutes misconduct by "clear and convincing evidence ." **In re McCool**, No. 15-0284, slip op. at 26, 31 (La. 06/30/15). Thus, the majority sweeps both protected and un-protected speech into the category of sanctionable conduct.

I certainly share the majority's concern that unfounded criticism can impede the judicial process. As one commentator also has noted, "with increasing frequency ... attacks on the judiciary ... are purely ideologically driven. This type of 'criticism' ... undermines the rule of law by suggesting that judges are free to ignore the relevant facts or the applicable law to reach the outcome sought by a special interest group." Steven M. Puiszis, The Need to Protect Judicial Independence, 55 No. 4 DRI For Def. 1 (Apr. 2013). Caustic though it may be, such speech even by a lawyer is protected by the First Amendment, as long as the speech does not, as it does here, contain misrepresentations or as the Supreme Court has explained, present a "substantial likelihood of material prejudice" to a case. **Gentile**, 501 U.S. at 1037.

[5]  The ODC cited unpublished disciplinary cases. It cited the public reprimand ordered in **The Florida Bar v. Conway**, SC08-326 (Fla. 10/29/08), 2008 WL 4748577, and administered by the Florida Bar in **The Florida Bar v. Sean William Conway**, TFB File No. 2007-51,308(17B), *available at* https://www.floridabar.org/DIVADM/ME/MPDisAct.nsf/daToc!OpenForm&AutoFramed&MFL =Sean%20William%20Conway&ICN=200751308&DAD=Public%20Reprimand (last visited 6/4/15).

recommended sanction of one year and one day suspension. While it is true that the novelty in Louisiana of the issues in this case presents certain challenges, this court is not without guidance and that guidance does not point to the disbarment the majority now imposes.

Specifically, the ABA Standards for Imposing Lawyer Sanctions address violations of a lawyer's duties to the legal system. Respondent's violations of her duties to the legal system are the crux of this case, even under the majority's analysis. However, under the rubric of "Improper Communications with Individuals in the Legal Systems," ABA Standard 6.32 provides a baseline sanction of a suspension for an ex parte "communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding." Under the same rubric of improper communications, disbarment is reserved for an ex parte communication which "causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding." ABA Standard 6.31(b). However, in its prosecution of this case, the ODC did not charge respondent with violating Rule 3.6[6]

---

In **Conway**, the lawyer maintained a website entitled "Judge Aleman's New (illegal) 'One-Week to prepare' policy," and referred to the judge throughout the website as an "EVIL UNFAIR WITCH." **Conway**, TFB File No. 2007-51,308(17B). The reprimand stated: "although attorneys play an important role in exposing valid problems within the judicial system, statements impugning the integrity of a judge, when made with reckless disregard as to their truth or falsity, erode public confidence in the judicial system without assisting to publicize problems that legitimately deserve attention."

The ODC also cited **In re: Kristine Ann Peshek**, M.R.23794 (Ill. 5/18/10), *available at* http://www.illinoiscourts.gov/SupremeCourt/Announce/2010/051810.pdf, and accepting the petition for discipline *available at* http://www.iardc.org/09CH0089CM.html (last visited 6/4/15). According to the petition in **Peschek**, the attorney referred to a judge as "Judge Clueless" and referred to another judge as "a total a******."

[6] Rule 3.6(a) of the Rules of Professional Conduct prohibits a lawyer from "mak[ing] an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."

6

or even allege that respondent's actions created a danger of imminent and substantial harm. Thus, the baseline sanction is suspension because of the potential for harm rather than a showing of actual harm. See ABA Standard 6.32; compare ABA Standard 6.31(b).

In contrast to these standards establishing a baseline of suspension, the majority's sanction analysis relies on **In re White**, 08-1390 (La. 12/02/08), 996 So.2d 266, 274, in which this court determined a lawyer's ex parte communications fell within a baseline sanction of disbarment. The majority presently describes our analysis in **In re White** as turning on the fact that the ex parte communication was "about seafood pricing information." **In re McCool**, No. 15-0284, slip op. at 39 (La. 06/30/15). While it is true that seafood prices were one topic of the lawyer's ex parte communications in **In re White**, the majority presently fails to mention that the seafood pricing information supplied by the lawyer was stipulated to be "relatively useless" to the judge and, therefore, our finding in **In re White** that the baseline sanction for certain ex parte communications was disbarment actually rested on the lawyer engaging in other communications. **In re White**, 08-1390 at 7, 996 So.2d at 270. To benefit his employer in a pending domestic dispute case, the lawyer engaged in ex parte communications to arrange for providing lavish gifts to a judge and his family. *Id.* at 7-8. Specifically, the lawyer stipulated to the following ex parte communications with Judge Bodenheimer, which were found to have been made with the intent to benefit the lawyer's client, restauranteur Al Copeland:

14. During the course of the Copeland/Hunter domestic relations proceedings, Bodenheimer requested and respondent provided complimentary appetizers and refreshments at one of Copeland's restaurants to Bodenheimer's daughter for a birthday. Although it was (and is) a regular and common practice of Copeland's restaurants to provide complimentary food and beverages to various members of the

7

public, respondent acknowledges that he should have declined Judge Bodenheimer's request.

15. Additionally, on another occasion, respondent provided promotional gift cards for complimentary food and refreshments at a Copeland's restaurant to members of Bodenheimer's staff during the time that the Copeland/Hunter proceedings were then pending. Although it was (and is) a regular and common practice of Copeland's restaurants to provide complimentary food and beverages to various members of the public, respondent acknowledges that he should have declined to furnish these promotional gift cards.

**In re White**, 08-1390 at 7-8, 11-12, 996 So.2d at 270, 272-73.

Here, and unlike **In re White**, there has been no allegation that the respondent engaged in ex parte communications as part of a *quid pro quo* exchange to curry favor with a judge during a pending case. Aside from **In re White**, which plainly deals with misconduct of a more egregious nature than the misconduct here, the majority's sanction analysis relies on cases in which this court suspended lawyers who engaged in ex parte communications. **In re McCool**, No. 15-0284, slip op. at 39-40 (*citing* **In re Lee**, 07-2061, p. 11 (La. 02/16/08), 977 So.2d 852, 858 (suspension of 6 months, all but 45 days deferred); **In re Simon**, 04-2947 (La. 06/29/05), 913 So.2d 816, 819 (suspension of 6 months, all but 30 days deferred); **In re Larvadain** 95-2090 (La. 12/08/95), 664 So.2d 395 (suspension of 3 months, fully deferred); **Louisiana State Bar Ass'n v. Harrington**, 585 So.2d 514 (La. 1990) (suspension of 18 months); and **Louisiana State Bar Ass'n v. Karst**, 427 So.2d 406 (La. 1983) (suspension of 1 year)). To disbar the respondent here, considering the suspensions cited by the majority, reveals that disbarment is not only disproportionate to the misconduct, but is impermissibly punitive. See **Louisiana State Bar Ass'n v. Reis**, 513 So.2d 1173, 1177-78 (La. 1987) (noting the primary purposes of disciplinary proceedings are to maintain the high standards and integrity of the legal profession, protect the public, and to deter misconduct, rather than punish the lawyer).

The suspension of one year and one day recommended by the hearing committee, disciplinary board, and ODC is consistent with the baseline of suspension under the ABA Standards. I would impose the recommended suspension, with one alteration. Because the misconduct here is novel in that this court has never directly addressed an attorney's use of social media and the internet and the ODC points to only two other states that have addressed misconduct involving improper internet postings, I would defer all but six months of the suspension subject to the condition that the suspension would be fully imposed if respondent were to commit misconduct during the period of active or deferred suspension. See **In re Raspanti**, 08-0954, p. 23 (La. 3/17/09), 8 So.3d 526, 540 (finding as a significant mitigating factor that "we are issuing a sanction for a matter for which no one has been sanctioned previously.").[7] The recommended suspension is also supported by the mitigating factor that respondent has no disciplinary history in over 14 years as a member of the bar.

Thus, I respectfully concur in part and dissent in part, with the opinion of the majority.

---

[7] Noting the novelty of internet blogging, one commentator suggests the rules governing the legal profession currently fail to equate blogging with an ex parte communication. See Rachel C. Lee, Symposium: Media, Justice, and the Law: Note: Ex Parte Blogging: The Legal Ethics of Supreme Court Advocacy in the Internet Era, 61 Stan. L. Rev. 1535 (April 2009). Here, respondent's conduct, such as her online petition, went beyond the type of commentary typically associated with blogging and, as earlier noted, I have no difficulty finding that the respondent has engaged in communications which violate the Rules of Professional Conduct. However, the commentary just cited underscores that this is a developing area of the law, a reality which weighs against imposing disbarment under the facts presented.

SUPREME COURT OF LOUISIANA

No. 2015-B-0284

IN RE: JOYCE NANINE MCCOOL

*ATTORNEY DISCIPLINARY PROCEEDINGS*

**GUIDRY, Justice, concurs in part and dissents in part.**

I concur that respondent should be sanctioned, but I dissent as to majority's imposition of disbarment and I would impose a suspension of three years.

**SUPREME COURT OF LOUISIANA**

**NO. 2015-B-0284**

**IN RE: JOYCE NANINE MCCOOL**

**ATTORNEY DISCIPLINARY PROCEEDINGS**

CRICHTON, J., additionally concurs and assigns reasons**:**

I wholeheartedly agree with the majority opinion in this matter. I write separately, however, to touch upon what I believe to be an outrageous disregard for the sacred profession we, as well as respondent, have chosen. The majority aptly notes that holding a law license is a great privilege. As United States Supreme Court Justice Benjamin Cardozo, then Judge on the Court of Appeals of New York, also stated almost a century ago: "Membership in the bar is a privilege burdened with conditions." *In re Rouss*, 116 N.E. 782, 783 (N.Y. 1917). Those conditions are numerous, and do not come without great sacrifice. Respondent is an "'officer of the court' in the most compelling sense,"[1] as the majority so correctly finds, and consequently, she is held to a higher standard than a non-lawyer member of the public. She cannot confuse a First Amendment claim of the right to free speech with a serious and intentional violation of the Rules of Professional Conduct, which are rules that apply both to her and to every lawyer. Not only did her conduct cause major disruptions in the course of litigation, it also unnecessarily put members of the judiciary at risk.

But perhaps respondent's most astounding and egregious action is her complete and utter lack of remorse, and defiance in the face of her impending sanction. At oral argument of this matter, respondent admitted she did "not have any remorse for [my] conduct" and that she would "continue to speak out and

_____

[1] *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720 (1991) (internal citations omitted).

advocate for change."  It is unfortunate that respondent does not seem to understand that being a zealous advocate does not equate to such repugnant disrespect for the system we are charged to honor and serve.  It is for these reasons I agree with the majority's decision to impose the most serious of sanctions: disbarment.

**SUPREME COURT OF LOUISIANA**

**NO. 2015-B-0284**

**IN RE: JOYCE NANINE MCCOOL**

**ATTORNEY DISCIPLINARY PROCEEDING**

**CANNELLA, J.,[*] concurring in part and dissenting in part.**

    I dissent in part as to the sanction and would impose a three year suspension, but I concur in all other respects.

---

[*] Retired Judge James L. Cannella, assigned as Justice ad hoc, sitting for Hughes, J., recused.